UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADAM STONE, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | 1:08-cr-00006-JAW |
| | ) | 1:11-cv-00007-JAW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER AFFIRMING RECOMMENDED DECISION AND DENYING MOTION FOR ORAL ARGUMENT**

In 2005, Adam Stone became obsessed with child pornography. Without anything apparent in his background to predict his actions, he downloaded substantial amounts of child pornography, some horrific, shared images of child pornography with a law enforcement officer posing as a fifteen-year-old girl, and masturbated over a webcam to this supposed teenager. In 2008, the Court sentenced him to a 210-month term of incarceration, the bottom of the applicable Guideline range. Having failed on direct appeal, Mr. Stone returns under 28 U.S.C. § 2255, seeking to vacate his sentence on the ground that his defense counsel should have ordered a psychosexual assessment. He urges the Court to conclude that such an assessment would have explained his actions by revealing his complete personal history, a history he earlier failed to disclose, and would have convinced that Court that he was unlikely to reoffend, resulting in a more lenient sentence. Although Mr. Stone presented a hard case in 2008 and now, the Court rejects his arguments and

denies the petition for a number of reasons, including its determination that his earlier misrepresentation of his personal history was a strategic choice and its conclusion that, in any event, his defense attorney acted in accordance with *Strickland*[1] standards.

## I.    STATEMENT OF FACTS

### A.    Background

On January 9, 2008, Adam Stone waived indictment and pleaded guilty to an information that charged him with knowingly transporting and shipping child pornography in interstate and foreign commerce.   *Minute Entry* (ECF No. 7); *Information* (ECF No. 2).  At the Rule 11 hearing, Mr. Stone admitted the contents of a prosecution version of the offense:

> In February 2005, a detective from the Wheaton Police Department in Illinois was conducting an internet crimes investigation.  He had assumed the undercover screen name of "brownhairedgirl_1" and had created a Yahoo! profile for that screen name.  On February 16, 2005, the detective logged on to a Yahoo! chat room.  He received an unsolicited private message from "adamstone78" asking "brownhairedgirl_1" whether she had any pictures of other girls.  The detective responded that she did not.  "[A]damstone78" asked "brownhairedgirl_1" to view his photo album that he had posted named "2004-09-11".  The photo album contained images of minors engaged in sexually explicit conduct.
>
> On February 17, 2005, the detective logged on to Yahoo! Chat using his undercover screen name.  During an online conversation with "adamstone78" he offered to let "brownhairedgirl_1" view him through a web camera.  After "adamstone78" began transmitting via the web camera, the detective was able to see a male sitting at a computer and moving around the room.  The male had short brown hair and a goatee.  The detective contacted the Maine Department of Motor Vehicles and that agency provided him with a digital image of the defendant.  The

---

[1]    *Strickland v. Washington*, 466 U.S. 668 (1984).

detective viewed the license image and positively identified the person in the image as the person he had viewed on the web camera.

On March 4, 2005, "brownhairedgirl_1" had an online conversation with "adamstone78". During that conversation, "adamstone78" sent "brownhairedgirl_1" an internet link (http://photos.yahoo.com/adamstone78). When the detective activated the link, he was given access to the shared photo albums of "adamstone78". The detective viewed two photo albums—one titled "2004-09-11" and one titled "2005-03-02". The detective viewed the images in each of the photo albums; dozens of the images depicted minors engaged in sexually explicit conduct.

At approximately 6:00 a.m. on April 1, 2005, "adamstone78" sent a message to "brownhairedgirl_1" that read in part: "I added 2 albums between yesterday and today, check em out." The detective used the link previously provided by "adamstone78" (http://photos.com/adamstone78) to view adamstone78's shared Yahoo! photo albums. The link showed four photo albums available for viewing. Two of the albums were the same albums that the detective had viewed on March 4, 2005. The two new albums were titled "2005-03-31" and "2005-04-01", respectively. In total, the detective viewed over 500 images in the albums, many of which appeared to be depictions of minors engaged in sexually explicit conduct. The detective saved the contents of all of the photo albums to his computer.

On June 13, 2005, federal law enforcement officers executed a search warrant at Stone's residence in Caribou. FBI Special Agent Herbert interviewed the defendant and the defendant told SA Herbert that he had downloaded child pornography from the internet and that he had placed images of child pornography in Yahoo! albums and allowed access to those albums. Subpoenaed records showed during the period relevant to this case, the user name "adamstone78" was registered to an Adam Stone with an address of P.O. Box 1096, Caribou, Maine, 04736.

SA Herbert seized three computers from Stone's residence and he seized other storage media (CDs). Images identified as possible child pornography during the computer forensic examination of the computer hard drives were sent to the National Center for Missing and Exploited Children (NCMEC). Also, images identified as possible child pornography that had been captured by the undercover detective from the defendant's online photo album on April 1, 2005, were submitted to NCMEC. NCMEC compared the submitted images posted on the

3

Yahoo! website and the submitted images seized from the defendant's computer against its international database of known child victims and identified 192 images of known children and six videos of known children, all related to 37 series.  Many of these images were found both on the hard drives and in the defendant's online photo album.  No videos were found in the defendant's Yahoo! photo albums.  A representative sample of the images from the photo albums is attached under seal as Exhibit A.  Exhibit A-1 is an image of a known child from the Heather series.  Exhibit A-2 is an image of a known child from the Misty series.

*Prosecution Version of the Offense* (ECF No. 4).

Following his guilty plea, Mr. Stone and the Government filed sentencing memoranda.  *Def.'s Mem. in Aid of Sentencing* (ECF No. 9); *Gov't's Mem. in Aid of Sentencing* (ECF No. 10) (*Gov't's Mem.*).  In addition to the facts in the prosecution version, the Government's memorandum asserted that the Yahoo! profile for the Wheaton, Illinois, detective's screen name "brownhairedgirl_1" indicated that "brownhairedgirl_1" was a fifteen-year-old female.  *Gov't's Mem.* at 2.  Furthermore, referring to the search warrant affidavit in this case, the Government revealed that Mr. Stone had not only offered to masturbate for brownhairedgirl_1 in front of his webcam but proceeded to do so.  *Id.* at 9 (citing *Gov't's Mem.* Attach. 1, *Aff. in Support of Application for Search Warrant*, ¶ 24).

The Presentence Report revealed that Mr. Stone had grown up in the commonwealth of Massachusetts and was raised in an intact family without any abuse or neglect.  *Revised Presentence Investigation Report* ¶ 27 (ECF No. 73) (PSR); *Tr. of Proceedings* at 42:24-25 (ECF No. 16) (*Sentencing Tr.*).  Mr. Stone graduated from Billerica High School in 1997, and in 2001, he found his way to Aroostook County, Maine, where he attended the Job Corps in Limestone, Maine.  PSR ¶¶ 27,

31; *Sentencing Tr.* at 43:2-4.  Mr. Stone had steady employment and a long-term relationship with his girlfriend.  PSR ¶¶ 27, 32; *Sentencing Tr.* at 43:4-6.  Mr. Stone did not have any alcohol or drug abuse problems.  PSR ¶ 30; *Sentencing Tr.* at 43:7-8.  He had a slight run-in with the law, resulting in two old larceny charges in Massachusetts, but no convictions.  PSR ¶ 26; *Sentencing Tr.* at 43:8-10.  With this background, the Court described his appearance in federal court for sentencing on a serious federal crime as "totally unheralded."  *Sentencing Tr.* at 43:10-11.

At the sentencing hearing, the Court calculated the Guideline sentence range as 210 to 262 months; however, because the statutory maximum was 240 months, the range was reduced to 210 to 240 months.  *Id.* at 39:8-11.  The Guidelines suggested a term of supervised release of at least two years and up to life, a fine from $20,000 to $200,000, and a special assessment of $100.  *Id.* at 39:12-17.

On April 7, 2008, this Court sentenced Adam Stone to 210 months incarceration followed by five years of supervised release and a $100 special assessment for transporting and shipping child pornography in violation of 18 U.S.C. § 2252A(a)(1).  *Minute Entry* (ECF No. 11); *J.* (ECF No. 12).  The Court imposed no fine.  *Id.*

On August 5, 2009, the Court of Appeals for the First Circuit affirmed the sentence.  *United States v. Stone*, 575 F.3d 83 (1st Cir. 2009).  On direct appeal, Mr. Stone's major attack on the sentence was that the Court had misperceived its authority under *Kimbrough v. United States*, 552 U.S. 85 (2007), to depart from the Guideline range based on the sentencing court's disagreement with the

congressional policy determinations reflected in the Guidelines. *Stone*, 575 F.3d at 89-94. The First Circuit rejected that argument. *Id.*

Mr. Stone's second argument was that the sentence of 210 months was substantively unreasonable. *Id.* at 94-97. The First Circuit expressed qualms about the harshness of the sentence, stating that "[w]ere we collectively sitting as the district court, we would have used our Kimbrough power to impose a somewhat lower sentence." *Id.* at 97. Nevertheless, the Court of Appeals affirmed the 210 month sentence. *Id.*

### B. Procedural History of Mr. Stone's § 2255 Motion

On January 6, 2011, Mr. Stone returned to this Court, seeking to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 on the ground that his defense attorney rendered constitutionally ineffective assistance at sentencing. *Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Fed. Custody* (ECF No. 27) (*Pet'r's Mot.*). The Government filed its opposition on January 24, 2012. *Gov't's Opp'n to Mot. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255* (ECF No. 71) (*Gov't's Opp'n*). Mr. Stone replied on March 29, 2012. *Pet'r's Reply to the Gov't's Opp'n to His Pet. for Relief Pursuant to 28 U.S.C. § 2255* (ECF No. 81) (*Pet'r's Reply*). On May 22, 2012, the Government filed a sur-reply. *Gov't's Resp. to Pet'r's Reply to Gov't Opp'n to Mot. to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255* (ECF No. 85) (*Gov't's Sur-Reply*).

On August 13, 2012, the Magistrate Judge issued a Recommended Decision in which she recommended that the petition be summarily denied. *Recommended Decision on 28 U.S.C. § 2255 Mot.* (ECF No. 86) (*Recommended Decision*).   Mr. Stone filed an objection on September 13, 2012. *Pet'r's Objections to the Magistrate Judge's Report and Recommendation on His Pet. for Relief Pursuant to 28 U.S.C. § 2255; Pet'r's Req. for Oral Argument* (ECF No. 89) (*Pet'r's Objection*).   The Government has not responded to Mr. Stone's objection.

## II.   THE PARTIES' POSITIONS AND THE RECOMMENDED DECISION

### A.   Adam Stone's § 2255 Challenge

In his seventy-seven-page memorandum, Mr. Stone forcefully argues that "[h]is appointed attorney, Virginia Villa, provided ineffective assistance during the sentencing proceeding, failing to investigate and then present substantial mitigating evidence." *Pet'r's Mot.* Attach. 1, *Mem. of Law in Support of Pet. for Relief Pursuant to 28 U.S.C. § 2255*, at 13 (ECF No. 27-1) (*Pet'r's Mem.*).[2]  Mr. Stone focuses his attack on the failure of defense counsel to "procure a psychological evaluation of Stone, which establishes, *inter alia*, that he poses minimal risk of re-offending," contending that "[b]ut for counsel's deficient performance, Stone's sentence probably would have been less than 210 months." *Id.*

After reviewing the history of the case, Mr. Stone turns to a psychological evaluation performed on December 17, 2010 by Dr. Craig S. King, a licensed clinical psychologist, licensed clinical social worker, and certified sex offender treatment

---

[2]    The document's internal pagination differs from the ECF pagination.  The Court uses the ECF pagination.

provider.   *Id.* at 28; *Confidential Psychosexual Evaluation* (ECF No. 29) (*King Report*).³  Dr. King reported that when Mr. Stone was young, he was unpopular, was teased by classmates, and was picked on because he was color-blind and the only Jewish child in his school.  *Pet'r's Mem.* at 29.  After graduating from high school, Mr. Stone attended college briefly but dropped out, causing his parents to kick him out of the house.  *Id.*   For a while he lived in a tent and began to get in trouble with the law.  *Id.*   Dr. King's assessment revealed that Mr. Stone had been molested as a teenager and had been addicted to painkillers at the time of his offense, facts not in the PSR.  *Pet'r's Mem.* at 30-31.

Dr. King concluded that Mr. Stone's sexual interests are not deviant.  *Pet'r's Mem.* at 35-36.  Dr. King opined that Mr. Stone was interested in "developed teenage girls" and that his conduct regarding brownhairedgirl_1 was "illegal, but it was not necessarily sexually deviant."  *Id.* at 36.  He noted that "adult male sexual interest in developed teenage girls is not abnormal as most adult males are attracted to the aforementioned."  *Id.*   Dr. King did not think that Mr. Stone's conduct toward brownhariedgirl_1 was "indicative of a heightened recidivism risk." *Id.*   Although he agreed that Mr. Stone's possession of child pornography, his engaging in sexual conversations with a teenage girl, and his masturbating over a webcam "is clearly very concerning," he observed that "there is no evidence that Mr. Stone made any plans or attempts to meet 'brownhairedgirl_1' or any other youth."

---

³       At the request of defense counsel, the Court sealed Dr. King's psychosexual evaluation.  It is unclear why—other than redacting the personal identifiers—it was necessary to do so.  Mr. Stone's memorandum, which is not sealed, extensively cites from and quotes the King Report.  *Pet'r's Mem.* at 28-37.

*Id.*  Ultimately, Dr. King concluded that Mr. Stone "poses a 'minimal to low risk' for committing subsequent Internet-based or contact sexual offenses." *Id.*

Turning to Attorney Villa's performance as defense counsel, Mr. Stone claims that her performance was deficient in that she failed to investigate, that she failed to advocate, and as a corollary, that she failed to present mitigating evidence. *Id.* at 39-48.  He says that Attorney Villa's failures were prejudicial to him. *Id.* at 49. Again, the heart of Mr. Stone's complaint is that Attorney Villa "did not enlist the services of a mental health professional to conduct a psychological evaluation of Stone or to testify at his hearing" and therefore "[n]o risk assessment was conducted or introduced." *Id.* at 50.  He points out that the PSR omitted "essential pieces of Stone's history," including his period of homelessness, his sexual molestation, and his addiction to pain medications. *Id.* at 52.  He claims that there was "absolutely no risk associated with such consultation." *Id.* at 51.  Mr. Stone maintains that the "[p]revailing norms" required defense counsel to "consult with and use a qualified expert in connection with the development and presentation of such mitigating evidence." *Id.* at 53-55.  Furthermore, Mr. Stone points to district court cases that had been reported at the time of Mr. Stone's sentencing hearing where the sentencing judges had relied on psychological evaluations to impose a below-Guideline sentence. *Id.* at 57-58.  Without a psychological report, Mr. Stone says that Attorney Villa was left with "unsupported assertions" that were "not enough to counteract the damning images and the reality of his behavior." *Id.* at 60.

Mr. Stone claims that an expert report, such as the one Dr. King produced, would have blunted the Government's "misleading" and "incorrect" claims about Mr. Stone's risk of recidivism. *Id.* at 62. He says that Attorney Villa allowed the Government's demonstrably inaccurate or inapplicable assertions to go unrebutted. *Id.* at 64. In his criticism of Attorney Villa, Mr. Stone stresses that her failure to investigate and advocate were not strategic choices, and he contends that she failed to do her only job after the guilty plea, namely to present mitigating evidence. *Id.* at 64-65.

Mr. Stone maintains that Attorney Villa's failings prejudiced him. *Id.* at 66-74. He observes that an expert report like Dr. King's would have been admissible at sentencing and asserts that it would have been helpful to the Court in determining the appropriate sentence. *Id.* at 67. Noting the Court's "genuine discomfort at the sentence it imposed," Mr. Stone says that "it is hard to imagine a record in which a court evinces less enthusiasm for the fairness and appropriateness of the sentence it nonetheless imposes." *Id.* at 73. Mr. Stone concludes that "it is probable that a psychological assessment of Stone which revealed that he poses a minimal risk of re-offending and put in context his aberrant behavior would have made a real difference at sentencing." *Id.* at 74.

### B.    The Government's Opposition

In its fifty-page opposition to Mr. Stone's petition, the Government quotes liberally from the PSR, noting that the Probation Officer (PO) described his initial explanations of his conduct as "guarded, defensive and inadequate" and "almost

callous." *Gov't's Opp'n* at 4 (quoting PSR ¶ 7).  The Government notes that the PO asked Attorney Villa to "do some education of" Mr. Stone.  *Id.*  Ultimately, after Mr. Stone wrote a letter explaining his conduct, the PO recommended that the Court grant Mr. Stone acceptance under United States Sentencing Guideline § 3E1.1.  *Id.*

The Government observes that Mr. Stone said "his childhood was a happy one," free from abuse of any form and characterized by supportive parents.  *Id.* at 5.  He reported that he lived with his long-term girlfriend, was in good health, had not been prescribed any medication, and had "never participated in any form of counseling or therapy."  *Id.*  He reported only occasional social drinking and having used marijuana only four times in his life.  *Id.*  The PO had "no information to warrant a Guideline departure or variant sentence."  *Id.*

The Government turns to Attorney Villa's deposition, taken for purposes of this petition.  *Id.* at 21.  The Government stresses that Attorney Villa decided against obtaining a psychological report because Mr. Stone "had been consistently unwilling to talk honestly about his prior history and why he engaged in the offense conduct."  *Id.* at 30.  Furthermore, she was aware of only one other instance in the District of Maine when a mental health expert had been used in connection with a child pornography sentencing.  *Id.*  She also testified that Mr. Stone had not informed her about much of the information that he now claims would have been revealed by a psychological assessment.  *Id.* at 31-32.

The Government contends that with the deposition of Attorney Villa, there is no need for an evidentiary hearing and that Mr. Stone's petition should be

summarily dismissed. *Id.* at 32-49. In the Government's view, the "existing record and results of the deposition of trial counsel clearly establish that there is not even a hint of deficient performance on counsel's part." *Id.* at 34. In fact, Attorney Villa was concerned that Mr. Stone might lose his three acceptance points because—as the PO observed—he was guarded and unwilling to be forthright, and she actually stopped the PO's presentence interview to avoid his loss of acceptance. *Id.* at 36-38. Thereafter, Attorney Villa worked with Mr. Stone to prepare a written statement that would satisfy the PO. *Id.* at 38. Instead, Mr. Stone wrote her a letter dated January 18, 2008, essentially denying that he was ever "turned on" by the child pornography and denying that he had masturbated to the images. *Id.* at 38. Attorney Villa was extremely concerned that if the contents of Mr. Stone's January 18, 2008 letter were revealed, he would lose acceptance. *Id.* at 39. Stressing that Attorney Villa had made a tactical judgment, the Government argues that Attorney Villa "had sound tactical reasons for abjuring a psychological evaluation of Stone for any reason, much less to determine his risk of recidivism specifically." *Id.* at 44. Finally, the Government points out that Mr. Stone "cites no authority holding that defense counsel's failure to obtain a psychological risk-assessment evaluation of a defendant in a child pornography case amounts to constitutionally deficient performance." *Id.* at 48.

## C.    Adam Stone's Reply

Mr. Stone filed a sixty-page reply. First, Mr. Stone reviews Attorney Villa's experience both in Minnesota and in Maine. *Pet'r's Reply* at 11-15.[4] Next, Mr. Stone carefully describes Attorney Villa's involvement in his case from the initial interview onward. *Id.* at 15-24. Mr. Stone turns to Attorney Villa's deposition testimony as to why she did not obtain a psychological assessment. *Id.* at 24-27. He points out that Attorney Villa initially said that she had not considered getting him evaluated by a mental health professional because she was concerned that he might not be honest with the psychologist. *Id.* at 24. Yet, she also acknowledged that because a client lies to her does not necessarily mean he would lie to an expert. *Id.* She also cited cost as a factor. *Id.* She then testified that she had considered a psychological assessment but had "very little to back it up." *Id.* She was concerned, however, that the assessment could confirm that Mr. Stone had in fact committed a "hands-on" offense, despite his denials. *Id.* at 25. Moreover, Attorney Villa was worried that if the psychological assessment revealed hands-on contact with a minor and suggested that he posed a risk of re-offending, she would be ethically constrained from arguing at sentencing that he did not pose such a risk. *Id.* at 26. Instead of referring Mr. Stone to a psychologist, she elected to attack the Guidelines. *Id.* at 27.

Having set the stage, Mr. Stone argues that Attorney Villa was inexperienced and that she devoted limited time to his case: not only was his case Attorney Villa's first child pornography case, but she spent "barely a week's worth of time on it; only

---

[4]     Again, the Court uses the ECF pagination, which differs from the document's internal pagination.

10 of the 41 hours consisted of 'substantive contact' with Stone." *Id.* at 28.  Mr. Stone disputes the Government's contention that Attorney Villa consulted with Federal Defender David Beneman on the case, noting that she testified that she "could not recall" whether she had and said only that she "may have." *Id.* at 29.

Furthermore, Mr. Stone criticizes Attorney Villa's decision to attack the Guidelines "before a judge she knew adhered to the [G]uidelines in all but the rare case, no less." *Id.* at 31.  Instead, Mr. Stone argues, Attorney Villa "should have provided the Court with verifiable assurance that a non-[G]uideline sentence would be sufficient to comply with 18 U.S.C. § 3553(a)'s aims, including that the public be protected from further crimes of the defendant." *Id.*  Mr. Stone accuses the Government of attempting to "paint [him] as an uncooperative, dishonest client" and ignoring information Mr. Stone did tell Attorney Villa.  *Id.* at 31-32.  He contends that Attorney Villa should not have stopped at his own statements but had an obligation to investigate further.  *Id.* at 34-36.

Mr. Stone next disputes the Government's stated justifications for Attorney Villa's failure to request a psychological risk assessment, arguing that in her deposition, Attorney Villa herself did not proffer the four justifications that the Government posits.  *Id.* at 36-37.  Mr. Stone describes the four Government justifications: (1) there was no local practice of obtaining psychological risk assessments in child pornography cases; (2) the sentencing judge assigned little value to psychological evaluations; (3) Mr. Stone had persistently refused to be honest with her and others; and (4) Mr. Stone might make statements to the

psychologist that would narrow the scope of permissible sentencing arguments and might even require disclosure to the prosecution. *Id.* (citing *Gov't's Opp'n* at 44-46).

Mr. Stone disputes each of these justifications as not supported by the evidence. He says that Attorney Villa did not discuss an absence of local practice; instead, she did not consider having him evaluated at all and he urges the Court not to create a justification for Attorney Villa's decision-making that she herself did not make. *Id.* at 37-38. Regarding the sentencing judge's past view of psychological assessments, Mr. Stone argues that the judge's general adherence to the Guideline range should have caused Attorney Villa "to supply him with an evaluation to justify an outside-the-[G]uideline sentence," rather than "to avoid consulting a mental health professional entirely." *Id.* at 46. Furthermore, he says that Attorney Villa should not have "presume[d] that the judge would penalize Stone simply for presenting evidence bearing" on a factor under 18 U.S.C. § 3553(a). *Id.* at 46-47. He dismisses the potential obligation to reveal information to the prosecution as "utterly baseless" since a defense lawyer is not ethically required to disclose expert information that she does not intend to actually use. *Id.* at 38. He contends that Attorney Villa's reservations about his honesty are "not worthy of stock." *Id.* at 42. Furthermore, Mr. Stone maintains that even if Attorney Villa thought he was not being forthright, she should still have requested the assistance of a mental health professional because her duty to investigate persists even when the defense attorney has doubts about her client's veracity. *Id.* at 45-46.

In addition, Mr. Stone contends that he was in fact prejudiced by her failure to obtain a risk assessment.  *Id.* at 47-55.  He points out that the *Strickland* standard is whether there is "a reasonable probability" that, but for counsel's constitutionally deficient performance, the result of the proceeding would have been different.  *Id.* at 48 (citing *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447, 455-56 (2009) (per curiam)).  Mr. Stone then discusses the scientific studies on recidivism among child pornography defendants and urges the Court to conclude that these studies reveal that people who access online child pornography do not present an enhanced risk of committing contact sexual offenses.  *Id.* at 52-55.

Finally, Mr. Stone disagrees with the Government's concern that a ruling in his favor would establish a base-line requirement of a psychological assessment in every child pornography case.  *Id.* at 56-57.  He claims that "[t]he government misunderstands the Sixth Amendment guarantee to effective assistance of counsel.  That guarantee is not measured in absolutes."  *Id.* at 56.  He cites cases where courts have rejected per se rules for measuring the performance of defense counsel.  *Id.* at 56-57.

### D.    The Government's Sur-Reply

In its Sur-Reply, the Government quotes *Strickland*'s emphatic statement that "[j]udicial scrutiny of counsel's performance must be highly deferential" and must "eliminate the distorting effects of hindsight."  *Gov't's Sur-Reply* at 1 (quoting *Strickland*, 466 U.S. at 689).  The Government disputes Mr. Stone's implication that because Attorney Villa had never before handled a child pornography case, her

16

representation must have been deficient, and stresses that the law is to the contrary, namely that inexperience alone does not constitute evidence of inadequate representation. *Id.* at 2. Furthermore, the Government points out that Attorney Villa spent a total of forty-one hours and conferred with him either over the phone or in prison for ten hours; the Government cites cases where Sixth Amendment claims have failed where the lawyer spent fewer hours in defense. *Id.* at 3. Next, the Government defends Attorney Villa's tactical decision not to present the sentencing judge, who had demonstrated a resistance to psychological studies, "the type of evidence that would not resonate with that particular judge." *Id.* at 4.

Citing *United States v. Encarnacion*, 181 F.3d 81 (1st Cir. 1998) (unpublished), and caselaw from other circuits, the Government maintains that "the extent to which a client refuses to cooperate with counsel is a relevant factor in evaluating a claim of ineffectiveness." *Gov't's Sur-Reply* at 4-5.

Moreover, the Government contends that, contrary to Mr. Stone's current view, there "was a real danger that a risk evaluation might portray Stone as a dangerous recidivist." *Id.* at 6. If that had happened, the Government maintains, Attorney Villa "could not simply turn a blind eye to that assessment and argue with a straight face at sentencing that Stone was unlikely to be a repeat offender." *Id.* Attorney Villa, according to the Government, believed that "withholding such evidence from the Court would be a breach of her ethical obligation to be straightforward with the Court" and "the very bar rules Stone cites support her

17

reasoning." *Id.* at 6-7.  Finally, the Government disagrees with the meaning and significance of the scientific studies relied upon by Mr. Stone.  *Id.* at 7.

### E.    The Recommended Decision

After reviewing the history of the case, the legal standards for a 28 U.S.C. § 2255 petition, and the parties' memoranda, the Magistrate Judge was "not persuaded that [Mr. Stone] has shown deficient performance by Villa." *Recommended Decision* at 10.  Observing that Mr. Stone had argued that obtaining an expert assessment posed no risk, the Magistrate Judge commented that "the riskiness of that action must be assessed in light of the information available to Villa at the time." *Id.*  The Magistrate Judge noted that "Villa felt that Stone was not telling her the whole truth, and she worried that an expert evaluation might result in more harm than good." *Id.*  The Magistrate Judge opined that Attorney Villa "could not have simply ignored any adverse findings, as Stone contends"; instead, "[s]uch findings would have negatively affected Villa's ability to advocate the best possible outcome for Stone." *Id.*

Turning to Dr. King's psycho-sexual evaluation of Mr. Stone, the Magistrate Judge thought that his evaluation actually "illustrates a risk that Villa avoided." *Id.*  She thought that the King Report contained "many inconsistencies with Stone's presentence investigation report" and that Mr. Stone provided "no explanation for these inconsistencies other than to blame Villa for not spending enough time meeting with him and working on his case." *Id.*  The Magistrate Judge noted that in another child pornography case, this Judge had expressed skepticism when a

18

defendant in a child pornography case was interviewed by a social worker and contradicted what he had told the Probation Officer. *Id.* at 9 (citing *United States v. Cameron*, 1:09-cr-00024-JAW, 2011 U.S. Dist. LEXIS 24878, *53-54 (D. Me. Mar. 11, 2011)). The Magistrate Judge noted that it was "not necessary to proceed to the prejudice prong" given her conclusion that Attorney Villa's performance was not deficient, but nonetheless opined that, in her view, Mr. Stone "fails to satisfy the deficient performance prong . . . as well as the prejudice prong" because Mr. Stone "cannot demonstrate a reasonable probability that he would have received a lower sentence if Villa had presented an expert evaluation." *Id.* at 11-12. The Magistrate Judge observed that the sentencing judge had "clearly indicated that the most important factor in selecting the sentence was Stone's online interaction with a person he believed was a 15-year-old girl" and "[n]othing in Dr. King's evaluation changed" that fact. *Id.* at 11. She recommended summary dismissal of the petition. *Id.* at 12.

## III.   ADAM STONE'S OBJECTION TO THE RECOMMENDED DECISION

Adam Stone filed a thirty-page objection highly critical of the Recommended Decision; the Government did not respond. *Pet'r's Objection* at 1-30. Mr. Stone initially objects to the Magistrate Judge's "discussion of the parties' pleadings, to the extent that it is intended to resolve disputes between them regarding counsel's deposition testimony." *Id.* at 2. Mr. Stone also "objects to the judge's characterization of counsel's testimony concerning her reasons for failing to consult with and enlist the services of a mental health professional." *Id.* Mr. Stone objects

to the Magistrate Judge's recommendations on both prongs of the *Strickland* analysis: the level of defense counsel's performance and whether defense counsel's performance was prejudicial. *Id.* at 3. Finally, Mr. Stone objects to the Magistrate Judge's recommendation that the petition be summarily dismissed and that the Court decline to issue a certificate of appealability. *Id.*

## A.   Alleged Factual Errors in the Recommended Decision

Mr. Stone attacks the Magistrate Judge's recitation of the facts, asserting that it contains numerous errors. *Id.* at 3-10. First, Mr. Stone says that the Magistrate Judge was wrong when she wrote that Attorney Villa had consulted with other attorneys during her representation of Mr. Stone. *Id.* at 4. He charges that "[t]he Magistrate Judge parrots the government's claim in the *Recommended Decision* without much in the way of qualification: 'Although she had represented hundreds of defendants, her first child pornography case was Stone's, and so she consulted other attorneys experienced in such cases.'" *Id.* (quoting *Recommended Decision* at 7). Mr. Stone maintains that Attorney Villa actually testified that she could not recall whether she had spoken to her supervising attorney and did not testify that she had spoken to any other lawyers. *Id.* He notes that Attorney Villa's time sheets do not reflect such consultation. *Id.*

Second, Mr. Stone says that the Magistrate Judge "again parrots" the Government's justifications for Attorney Villa's decision-making, justifications that Attorney Villa herself had not made. *Id.* at 4-5. He describes as "problematic" the Magistrate Judge's discussion of defense counsel's justifications. *Id.* at 6. Mr. Stone is "incredibly dubious" about Attorney Villa's contention that he was not being

completely "forthright" with her, particularly regarding his asserted lack of sexual interest in children, and he objects to the Magistrate Judge's adoption of Attorney Villa's stated concern.  *Id.*   Mr. Stone points to Attorney Villa's deposition in which she testified that she "had no basis to believe or disbelieve" his assertion.  *Id.* (quoting *Gov't's Opp'n* Attach. 1, *Dep. Tr. of Virginia Villa*, 52:22-53:3 (ECF No. 71-1) (*Villa Dep.*)).

Mr. Stone also objects to the Magistrate Judge's comment that "there [was] nothing in the record indicating why [Mr. Stone] did not provide" his lawyer with historical information omitted from the PSR.  *Pet'r's Objection* at 6-7.  He offers two "likely explanations."  *Id.* at 7.   First, he asserts that despite Attorney Villa's acknowledgement that client trust grows as a lawyer spends more time with the client, "counsel spent virtually no time with Stone."  *Id.*   Second, Mr. Stone complains that Attorney Villa's attitude toward him was "dismissive," noting that she "glibly pegged him a 'foolish fellow' in a memorandum."  *Id.* (quoting *Villa Dep.* at 112:15-21).  In addition, Attorney Villa acknowledged that Mr. Stone may have been paranoid and this condition may have explained his request that she not take notes during their initial meeting and his conduct during the presentence interview. *Id.*  Finally, Mr. Stone observes that Attorney Villa "did argue at Stone's sentencing that he truthfully denied [an] interest in children."  *Id.*

Mr. Stone, however, sees a "more fundamental problem" with the Magistrate Judge's Recommended Decision.  *Id.*  He says that "[l]ike the government, the judge attributed to defense counsel concern that some discovery or ethical ramifications

would flow from a negative evaluation." *Id.* However, citing a portion of Attorney Villa's deposition transcript, he maintains that Attorney Villa "**denied** that such discovery or ethical ramifications truly weighed on her." *Id.* (emphasis in original) (citing *Villa Dep.* at 80:6-94:17). Based on Attorney Villa's testimony, Mr. Stone argues that the Magistrate Judge violated the rule against substituting, and that the Magistrate Judge "should have limited her assessment of defense counsel's performance" to Attorney Villa's actual justifications, which were limited to "(1) Stone's minimization; (2) financial constraints; [and] (3) skeptical audience." *Pet'r's Objection* at 10.

### B.   Deficient Performance

Mr. Stone contends that the Magistrate Judge's finding that Attorney Villa did not perform deficiently is "legally and logically faulty." *Id.* at 11. He says that Attorney Villa's "suspicion that Stone was 'minimizing,' putative discovery and ethical ramifications flowing from a negative evaluation, and the Court's adherence to the [G]uidelines simply did not provide counsel objectively reasonable bases for failing altogether to investigate and present mitigating psychological evidence in aid of sentencing." *Id.*

#### 1.   Minimization

Mr. Stone states categorically that Attorney Villa's "sense that Stone was being dishonest and her fear that a psychological evaluation therefore 'might result in more harm than good,' *see Recommended Decision*, p. 10, absolutely does **not** provide a sound basis for failing to at least investigate mitigating psychological

evidence." *Pet'r's Objection* at 11 (emphasis in original).  According to Mr. Stone, Attorney Villa's "mere suspicion that investigation will turn up something bad is not ground to avoid that investigation altogether." *Id.*  Second, Mr. Stone says that "counsel does not discharge her duty to investigate solely by speaking to her client," especially as Attorney Villa perceived that Mr. Stone was "reluctant to speak to her." *Id.* at 12.  Finally, Mr. Stone points out that a defense lawyer's duty to investigate "exists regardless of her understanding of the incriminating evidence against her client." *Id.* at 13.  Mr. Stone charges that Attorney Villa's "putative disbelief" in Mr. Stone's stated sexual disinterest in children was "premised upon her take on the incriminating evidence"; he characterizes her decision not to investigate based only on her own impressions as "ethically-suspect." *Id.*

Mr. Stone describes Attorney Villa's minimization justification as "practically speaking, nonsensical." *Id.*  Mr. Stone observes that Dr. King recommended that he participate in therapy to gain insight into what led to his interest in teenage girls and preoccupation with pornography and he says that it "makes no sense to suggest that the assistance of a mental health professional should not be sought because the defendant has not yet done what the mental health professional would hope to accomplish." *Id.* at 14.  Mr. Stone contends that, according to empirical studies, his minimization is "not indicative of a heightened risk of recidivism." *Id.*

### 2.    Discovery and Ethical Risks

Mr. Stone vigorously challenges the Magistrate Judge's statement that defense counsel "could not have simply ignored any adverse findings." *Id.* at 14-15

(quoting *Recommended Decision* at 10). Mr. Stone begins with the premise that there is "no discovery rule that would obligate counsel to reveal an unfavorable evaluation." *Pet'r's Objection* at 15. Similarly, he says there is no ethical rule that would have required Attorney Villa to do so. *Id.*

Next, Mr. Stone dismisses the Magistrate Judge's concern that an unfavorable evaluation "would have negatively affected [counsel's] ability to advocate" at sentencing. *Id.* (quoting *Recommended Decision* at 10). He says that the Magistrate Judge did "not explain how." *Id.* Nor, according to Mr. Stone, did Attorney Villa, except by "testif[ying], confusingly, that she could not have argued that Stone's case did not involve a victim who was physically harmed if she learned that he had committed a hands-on offense." *Id.* Mr. Stone itemizes the points Attorney Villa made during her sentencing presentation and he says that none would have been affected by information learned upon referral to a health care specialist. *Id.* at 16.

Mr. Stone maintains that the "Magistrate Judge's unadorned suggestion (and counsel's testimony) evinces a serious misunderstanding of the requirement of candor to the tribunal." *Id.* at 16. He claims that "nothing about the candor requirement [Rule 3.3 of the Maine Rules of Professional Conduct] would have prevented counsel from presenting a carefully-crafted argument regarding risk of re-offense despite negative results." *Id.* at 17-18. Instead, counsel could have argued those factors unaffected by the report, such as lack of criminal history, good behavior since the investigation began, and an excellent support system. *Id.* at 18.

24

### 3.    Unreceptive Court

Mr. Stone rejects the Magistrate Judge's adoption of "defense counsel's claim that she abstained from investigating and presenting mitigating psychological evidence because of her skeptical audience." *Id.*  He says that "[t]his justification is no more reasonable than Stone's alleged minimization." *Id.*  Mr. Stone argues that "[t]he fact that the sentencing court is known to adhere to the [G]uidelines is impetus to supply it with an evaluation to justify an outside-the-[G]uideline sentence, not a reason to avoid consulting a mental health professional entirely." *Id.*  He maintains that "[i]t is not appropriate to presume that the judge would penalize Stone simply for presenting evidence bearing on [18 U.S.C. § 3553(a)]." *Id.* at 19.

### 4.    Improper Hindsight

Next, Mr. Stone accuses the Magistrate Judge of "[p]aying lip service to the principle that defense counsel's performance [must] not be assessed through hindsight." *Id.*  He explains that the Magistrate Judge used Dr. King's evaluation and the sentencing judge's later written decision in *Cameron* "to conclude that counsel did not perform deficiently." *Id.*  The context is that in *Cameron*, the defendant presented a report from a social worker that stated that the defendant "had become 'addicted to talking about sex and seeing those images.'" *Cameron*, 2011 U.S. Dist. LEXIS 24878 at *53.  However, in his interview with the Probation Office, Mr. Cameron had said that the photographs were not his "primary interest" and that he would often not even look at the photographs people were sending him.

*Id.*  In *Cameron*, the Court was dubious about the conflict between what the defendant told the PO and what he told the social worker.  *Id.*  In his case, however, Mr. Stone says that "[c]ounsel could not have divined that an evaluation would include supposed 'inconsistencies' or that the Court would look unkindly upon them."  *Pet'r's Objection* at 19.  Instead, Mr. Stone points out that Attorney Villa had "an abundance of time **before** the presentence interview to discover the salient background and characteristics that the Magistrate Judge now deems 'inconsistent' with those the probation officer memorialized."  *Id.* at 20 (emphasis in original).

### 5.  Information Known to Defense Counsel

Having discussed information Mr. Stone contends Attorney Villa did not know but the Magistrate Judge nevertheless used, Mr. Stone turns to information he contends Attorney Villa did know and the Magistrate Judge did not, but should have used.  *Id.* at 20-24.  He points out that Attorney Villa learned long before sentencing that Mr. Stone attended special education classes and was treated for ADHD.  *Id.* at 20.  He notes that Attorney Villa testified that her experience taught her that there was a correlation between ADHD and large collections of child pornography.  *Id.* at 21.  Furthermore, according to Mr. Stone, Attorney Villa learned that Mr. Stone was or may have been paranoid, was unpopular at school, looked like a geek, was in marching band, and did not have a lot of friends.  *Id.*  Mr. Stone charges that despite her knowledge, Attorney Villa failed to "procure any records," and made no attempt to "flesh out Stone's special education, ADHD, or paranoia at sentencing."  *Id.* at 22.  Mr. Stone claims that the Magistrate Judge's

failure to "address Stone's argument in this respect is error," and that her "ultimate conclusion, reached through backwards-looking analysis, is flat out wrong." *Id.* at 23-24.

### 6.    Prejudice

Mr. Stone criticizes the Magistrate Judge's conclusion that Attorney Villa's "failure to investigate and present mitigating psychological evidence did not cause [him] harm." *Id.* at 24.  He disputes the Magistrate Judge's view that Mr. Stone's contact with brownhairedgirl_1 was the most troubling part of the case from the sentencing judge's viewpoint and that "[n]othing in Dr. King's evaluation changed the fact that Stone had engaged in that conduct." *Id.*  Furthermore, Mr. Stone challenges the Magistrate Judge's comment that "inconsistencies between the presentence investigation report and an evaluation such as Dr. King's probably would not have benefited Stone before the Court." *Id.* (quoting *Recommended Decision* at 11-12).  Mr. Stone contends that the alleged inconsistencies between the PSR and Dr. King's report "may well have been the fault of counsel, who was unable or unwilling to establish a trusting relationship with her paranoid client." *Id.*  Moreover, Mr. Stone argues, "[**h**]**ad counsel done her job in a timely manner, there would be no inconsistencies to speak of.**" *Id.* (emphasis in original).

Expanding on his criticism of the Magistrate Judge's reasoning, Mr. Stone argues that an expert evaluation at sentencing cannot change the fact that a defendant committed a crime; rather, he stresses, "[e]xpert evaluations offered in aid of sentencing are necessarily meant to **explain** the defendant's conduct, not to

disprove that it happened." *Id.* at 25 (emphasis in original).  Mr. Stone reviews the sentencing judge's stated concern about Mr. Stone's actions and the risk that he presented to the general public and urges the Court to conclude that Dr. King's report would have presented the sentencing judge with precisely what the Court was looking for but was not offered at the sentencing hearing.  *Id.* at 26.

Mr. Stone then addresses *Cameron*.  Mr. Stone says that unlike Mr. Cameron, he never sought to minimize his conduct and the only evidence that he may have done so is Attorney Villa's own impression that he was not being forthright.  *Id.* at 27-28.  Second, Mr. Stone argues that the standards are different in Mr. Cameron's sentencing and Mr. Stone's § 2255 petition; the standard for Mr. Stone's petition being whether "there is a **reasonable probability** that he would have received another sentence."  *Id.* at 28 (emphasis in original).

### C.    Oral Argument and Certificate of Appealability

Describing his claim as "novel and exceedingly nuanced," Mr. Stone urges the Court to grant oral argument.  *Id.* at 29.  Moreover, Mr. Stone claims that he has at least made the "substantial showing of the denial of a constitutional right" required for a certificate of appealability.  *Id.* at 29 (quoting 28 U.S.C. § 2253(c)(2)).

## IV.    DISCUSSION

### A.    Standard of Review for a Recommended Decision

The Magistrate Judge issued her Recommended Decision pursuant to 28 U.S.C. § 636(b)(1)(B).  Upon timely objection to the Recommended Decision, this Court is required to make "a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see Gioiosa v. United States*, 684 F.2d 176, 178 (1st Cir. 1982).

### B.  Ineffective Assistance of Counsel

### 1.  General Standards

The legal standards for a claim of constitutionally ineffective assistance of counsel under 28 U.S.C. § 2255 are well-settled and were articulated in the seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984).[5]  To succeed on such a claim, a defendant "must establish both that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Turner v. United States*, 699 F.3d 578, 584 (1st Cir. 2012); *see also Strickland*, 466 U.S. at 687-88.  The two components of an ineffective assistance claim are known as the "performance prong" and the "prejudice prong."  *See Pina v. Maloney*, 565 F.3d 48, 54 (1st Cir. 2009) (citing *Strickland*, 466 U.S. at 687).

Regarding the performance prong, the Supreme Court wrote in *Strickland* that the "proper standard for attorney performance is that of reasonably effective assistance."  *Strickland*, 466 U.S. at 687.  In other words, the defendant must show "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  "In considering counsel's performance, 'we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

---

[5]       In *Glover v. United States*, 531 U.S. 198 (2001), the Supreme Court extended *Strickland* to non-capital sentencing hearings.  *Id.* at 203 ("any amount of actual jail time has Sixth Amendment significance"); *see also Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012).

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Pina*, 565 F.3d at 55 (quoting *Strickland*, 466 U.S. at 689) (internal punctuation omitted).  Moreover, "[t]he Constitution guarantees only an 'effective defense, not necessarily a perfect defense or a successful defense.'" *Peralta v. United States*, 597 F.3d 74, 79 (1st Cir. 2010) (quoting *Scarpa v. DuBois*, 38 F.3d 1, 8 (1st Cir. 1994)).  The Court's "review of counsel's performance must be deferential, and reasonableness must be considered in light of 'prevailing professional norms.'" *Peralta*, 597 F.3d at 79 (quoting *Strickland*, 466 U.S. at 688).  In addition, the analysis should ignore the benefits of hindsight: *Strickland* requires a court to "reconstruct the circumstances of counsel's challenged conduct" and to "evaluate the conduct from counsel's perspective at the time." *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 789 (2011) (quoting *Strickland*, 466 U.S. at 689).

In propounding *Strickland*'s standard of reasonable effectiveness, the Supreme Court cautioned that "[m]ore specific guidelines are not appropriate." *Strickland*, 466 U.S. at 688.  Nevertheless, the *Strickland* Court proceeded to discuss "certain basic duties" that apply to the representation of criminal defendants, *Strickland*, 466 U.S. at 688, and Mr. Stone contends that Attorney Villa violated two such duties: (1) the duty to investigate; and (2) the duty to advocate. *Pet'r's Mem.* at 39-46; *see Dugas v. Coplan*, 428 F.3d 317, 327 (1st Cir. 2005) ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary") (quoting *Strickland*,

466 U.S. at 691); *Strickland*, 466 U.S. at 688 ("From counsel's function as assistant to the defendant derive[s] the overarching duty to advocate the defendant's cause").

Deficient performance alone does not merit relief under *Strickland*, however; the defendant must also show prejudice. "In order to satisfy the 'prejudice' prong, [a defendant] must establish that 'but for his counsel's deficiency, there is a reasonable probability that he would have received a different sentence.'" *Peralta*, 597 F.3d at 79 (quoting *Porter*, 558 U.S. 30, 130 S. Ct. at 453). "Although [a defendant] need not show 'that counsel's deficient conduct more likely than not altered the outcome' of his sentencing proceeding, he must establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Id.* at 80 (quoting *Strickland*, 466 U.S. at 693-94).

### 2.    Defense Counsel's Duty to Investigate and Present Mitigating Evidence at Sentencing

In his memorandum, Mr. Stone asserts that Attorney Villa had a duty to investigate and present mitigating evidence at the sentencing hearing. *Pet'r's Mem.* at 46-49. In support, Mr. Stone cites two capital cases—*Williams v. Taylor*, 529 U.S. 362 (2000), and *Rompilla v. Beard*, 545 U.S. 374 (2005)—and an unpublished opinion from the Middle District of Georgia, *Richardson v. United States*, Nos. 3:07-cv-90016, 3:05-cr-19, 2009 WL 152483 (M.D. Ga. Jan. 20, 2009). Mr. Stone presents less than resounding support for extending the "duty to present mitigating evidence" to a non-capital case in the First Circuit.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the United States Supreme Court, again addressing a capital case, emphasized that "*Strickland* does not require

counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 533.  The *Wiggins* Court went on to say that *Strickland* does not "require defense counsel to present mitigating evidence at sentencing in every case." *Id.*  Instead, the Supreme Court stressed that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation' [and a] decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91).  Moreover, a court must make this assessment "applying a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691, and must consider "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

The First Circuit has recognized that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Dugas v. Coplan*, 428 F.3d 317, 328 (1st Cir. 2005) (quoting *Rompilla*, 545 U.S. at 383).  Indeed even where the Government has retained an expert, a defense lawyer "does not have a duty in every case to consult experts." *Id.* (quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)).  In short, although a defense lawyer has a duty to investigate, it is not nearly as stringent in a non-capital case as Mr. Stone asserts; instead, a failure to investigate is measured by what a reasonable attorney would have done in similar circumstances.

### 3.    Post Hoc Rationalization

Mr. Stone correctly cites *Wiggins v. Smith*, 539 U.S. 510 (2003), for the proposition that courts may not use a "*post-hoc* rationalization of counsel's conduct" as opposed to "an accurate description of their deliberations prior to sentencing." *Id.* at 526-27.   For further support, he cites three Ninth Circuit cases in which the appellate court rejected post hoc rationalizations.   *Pet'r's Objection* at 9-10 (citing *Duncan v. Oronoski*, 528 F.3d 1222, 1235, 1237 n.7 (9th Cir. 2008); *Alcala v. Woodford*, 334 F.3d 862, 871 (9th Cir. 2003); *United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989)).

Although it is true that courts "may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions," *Harrington*, 131 S. Ct. at 790 (quoting *Wiggins*, 539 U.S. at 526-27), the Court's analysis of counsel's actions must be more deferential than Mr. Stone's argument allows.   The Supreme Court has warned that courts may not "insist counsel confirm every aspect of the strategic basis for his or her actions."   *Id.* Instead, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"   *Id.* (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)).   Furthermore, the Supreme Court has recognized that "[a]fter an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome."   *Id.*   The *Harrington* Court

emphasized that "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.*; *see also Companonio v. O'Brien*, 672 F.3d 101, 110 (1st Cir. 2012) ("Performance is measured against an objective standard of reasonableness") (internal punctuation omitted).

In assessing whether Attorney Villa's justifications meet *Strickland* standards, the Court has been mindful to apply these legal precepts to its analysis. Moreover, the Court observes that at least a portion of Mr. Stone's argument falls into the same category of post hoc thinking that he elsewhere criticizes. Mr. Stone's argument is premised on the assumption that if only Attorney Villa had asked for a psychosexual report, she would have received a report like Dr. King's. Mr. Stone presents Dr. King's post-sentencing product and criticizes Attorney Villa for not obtaining Dr. King's report (or something like it) before sentencing. But the question under *Strickland* is not whether competent defense counsel would have used Dr. King's post-sentencing examination at sentencing. Rather, the question is whether, knowing that a mental health evaluation (possibly like Dr. King's, but possibly very different from Dr. King's) could have been obtained, competent counsel would have requested one.

## C.    Analysis

Based on a careful analysis of Attorney Villa's deposition and of all the facts in this case, the Court concludes that Attorney Villa's representation of Mr. Stone not only met the constitutional standard of reasonable effectiveness, but exceeded

that standard by skillfully securing for him the acceptance of responsibility sentencing reduction.

### 1.   Attorney Villa's Deposition

#### a.   The Danger of Admissions

Attorney Villa began her November 29, 2012 deposition by observing that while she was practicing criminal defense law in Minnesota, there had been "a lot of discussion" in the context of civil commitments about studies "relating to people who viewed child pornography and how many had hands-on offenses that were not discovered until they got into the Bureau of Prisons." *Villa Dep.* at 6:12-17. She recalled that the "common wisdom at the time was that it was a danger that people who had only the viewing of pornography offenses could be coerced in a way of admitting to hands-on offenses through the milieu of the Bureau of Prisons treatment program." *Id.* at 6:18-22. She testified that for those individuals it was "strongly recommended" that they not participate in sex offender treatment "because of the chance that they would admit to offenses that they had not actually committed due to the coercion of having to admit and then get better in a psychological treatment format." *Id.* at 6:23-7:4.

#### b.   Attorney Villa Meets Adam Stone: A Guarded Client

Attorney Villa described her first meeting with Mr. Stone. *Id.* at 38:22-39:4. She described him as "initially very guarded" and she recalled that he had requested she take no notes during the interview. *Id.* Attorney Villa recalled that she met with Mr. Stone after she had viewed the pornography on his computer and

that she was aware that there was "tons and tons and tons and tons" of both adult and child pornography, a "huge collection." *Id.* at 41:19-24. She remembered that Mr. Stone had "specifically denied ever being interested in children sexually at all." *Id.* at 42:23-24.

### c.      The Sentencing Judge: Prior Experience

She was then asked about her prior experience in submitting psychological reports to this judge on the issue of diminished capacity. *Id.* at 49:14-20. She testified that her efforts to obtain diminished capacity downward departures by using psychological reports were often not successful. *Id.* at 49:14-50:9.

### d.      The January 18, 2008 "To Whom It May Concern" Letter

Attorney Villa was questioned about a "To Whom It May Concern" letter dated January 18, 2008, that she received from Mr. Stone. *Id.* at 51:4-52:11; *see Gov't's Opp'n* Attach. 6, Letter from Adam Stone To Whom It May Concern (Jan. 18, 2008) (*Stone Letter*). In the letter, Mr. Stone says, among other things, that sometime in 2003 or 2004, he "began looking at child pornography." *Stone Letter* at 3. However, he denied that he was "turned on" by the images and explained that he was "curious what girls of younger ages look like." *Id.* He also asserted that he "never went back to look at the pictures over and over nor did I ever masturbate or look at these pictures in a sexual way." *Id.*

### e.      Attorney Villa's Concerns About Adam Stone's Truthfulness

Attorney Villa said that the Stone letter concerned her as to whether he was "being forthright"; yet, she testified she had "no basis to believe or disbelieve what it

was in this letter." *Villa Dep.* at 52:20-53:3. At the same time, she worried that the contents of the letter were "really inconsistent with his offense behavior" and believed that his assertions about the non-sexual nature of motivations were "definitely not accurate." *Id.* at 55:7-14, 57:19-58:15. As to Mr. Stone's claim that he had only an anatomical interest in the differences among women's bodies, Attorney Villa, who had reviewed his collection of child pornography, testified that she believed "that that statement probably was not accurate" and, in fact, she agreed that it was "definitely not accurate." *Id.* at 58:4-15. She confirmed that Mr. Stone had "images of sadism . . . involving children," images of "very, very young children being raped," and images of "very, very young children involved in all sorts of sexual conduct." *Id.* at 58:16-23.

Furthermore, despite Mr. Stone's written insistence that he lacked any sexual interest in the images, that he had never masturbated over the images, and that he had only saved the images to trade, Attorney Villa knew that Mr. Stone had not only downloaded and saved the images but that he had also saved them onto a disk. *Id.* at 59:17-60:1. Attorney Villa testified that "there is a concern that when you have child pornography saved to disks that it is for the purpose of future reference." *Id.* at 60:13-15.

Also, Mr. Stone represents in his letter that his fiancée Heather had discovered the child pornography on his computer "about two weeks before the FBI came in" and had told him to clean up his computer "or she was leaving." *Stone Letter* at 3. Mr. Stone says that he "wasn't about to lose the love of [his] life over

this, so [he] decided it was time to clean up [his] computer." *Id.*  Yet, he waited for two weeks, and then, according to the letter, he "decided it was time to clean up [his] computer" and "[t]he day before [his] computers were seized [he] told Heather that the next day after work, [he] was going to go to Walmart and buy a new hard drive and was going to move on before [he] got into trouble." *Id.* at 3-4.  But there is no explanation for why Mr. Stone did not act immediately to remove the child pornography from his computers when confronted by his fiancée.  This delay told Attorney Villa that Mr. Stone "knew it was wrong and that despite knowing that it was wrong, that he was not getting rid of the child pornography." *Villa Dep.* at 62:1-5.

With this said, later in her deposition, Attorney Villa acknowledged that as a federal defender, it is not uncommon for her clients not to fully trust her.  *Id.* 106:21-107:6.  At the same time, when asked directly whether she thought that if she had spent more time with Mr. Stone, he would have gained more trust in her, she said that she was not sure that he would have.  *Id.* at 126:14-20.

She also confirmed that she often engages in "collateral information gathering," such as seeking out medical records and talking to family and friends about the client.  *Id.* at 107:21-108:16.  Here, although she met with Heather, Mr. Stone's fiancée, with Mr. Stone present, she did not meet with Heather alone.  *Id.* at 110:13-111:2.  Attorney Villa volunteered that Mr. Stone was "very loathe to have his parents be contacted" so there was a "narrow range of who I could turn to regarding him." *Id.* at 112:5-8.  Generally, Attorney Villa concluded that Mr. Stone

38

fell into a category of client who is not forthcoming and is not dealing appropriately with the seriousness of the case. *Id.* at 117:4-11. Yet she did not gather any collateral information about Mr. Stone. *Id.* at 119:14-18. She did not obtain his Job Corps records, gather information about his ADHD, obtain information about the cases that were reflected on his criminal record printout, speak to his parents before the day of sentencing, or separately interview Heather. *Id.* at 119:19-120:9.

### f.    Truth and the Guideline Calculations

She was concerned that the contents of Mr. Stone's letter could have negatively affected his Guideline calculation. First, she thought the letter "possibly implicated acceptance of responsibility." *Id.* at 58:24-59:5. In addition, noting that Mr. Stone had written that he had "saved the pictures to trade," *Stone Letter* at 3, Attorney Villa was aware that there was an "enhancement for trading" and that Mr. Stone's admission could have further increased his Guideline range. *Id.* at 59:6-16.

### g.    Adam Stone's Risk Factors

When questioned about her perception of Mr. Stone's risk factors for recidivism, Attorney Villa observed that the contents of Mr. Stone's letter evinced "either an unwillingness or an inability to address why he got into trouble in the first place" and that "he never could answer my questions as to what his motivations were without saying . . . I'm not interested in that." *Id.* at 66:13-18. Attorney Villa's concern was that "throughout this case," he demonstrated "just an inability to wish to address where this behavior came from."[6] *Id.* at 66:19-21.

---

[6]    Attorney Villa also discussed a woman who showed up at the Portland federal courthouse, who claimed she had had an affair with Mr. Stone, and who was very upset because she wanted to be

### h.      What Adam Stone Told His Lawyer

Ms. Villa was asked about her file notes.  At Mr. Stone's request she had taken no notes at their first meeting; however, her file may have contained two or three pages of "very sketchy" notes from that meeting.  *Id.* at 69:4-14.  She testified that those notes revealed that Mr. Stone had undergone "knee surgery," spent "two weeks off feet," and "three to six months physical therapy."  *Id.* at 69:22-25.  Her notes said that Mr. Stone began collecting child pornography about the time of his knee surgery and recovery; he explained that he had become "bored and that's what he did."  *Id.* at 70:1-4.  Mr. Stone did not mention any problems he experienced with drugs at the time of his knee surgery.  *Id.* at 70:5-7.

### i.      What Adam Stone Told the Probation Officer

After he entered a guilty plea on January 9, 2008, Mr. Stone and his attorney met on January 16, 2008, with Darlene Emerson, a United States Probation Officer (PO), for a presentence investigation report interview.  *Id.* at 70:15-71:3.  When PO Emerson asked Mr. Stone about any problems he had had with drugs, either legal or illegal, Attorney Villa's notes reflect the underlined word, "never."  *Id.* at 72:3-13.  Mr. Stone's response to PO Emerson was consistent with his prior statements about drug use or abuse to Attorney Villa.  *Id.* at 73:9-15.

PO Emerson also asked Mr. Stone questions to determine whether he qualified for acceptance of responsibility.  *Id.* at 73:20-75:3.  Attorney Villa was aware that PO Emerson exhibited "fairly open body language when she was not

---

present at his sentencing.  *Villa Dep.* at 66:23-68:23.  The Court does not consider this episode at all relevant to Mr. Stone's sentencing.

happy with somebody." *Id.* at 75:6-8. Attorney Villa's notes say "can't say why," "didn't know why he did it," "she found out few days before," "found photos on computer," "didn't want to talk about it," "haven't talked about why," "curiosity thing, nothing sexual about it." *Id.* at 76:3-8. When it appeared to Attorney Villa that PO Emerson was unhappy with Mr. Stone's responses, Attorney Villa interrupted the interview and told PO Emerson that they would submit a statement about acceptance in written form. *Id.* at 75:8-14.

### j.      Adam Stone's Acceptance of Responsibility Letter

After PO Emerson's aborted interview, Attorney Villa and Mr. Stone met, and with his assistance, she drafted a statement of acceptance of responsibility. *Id.* at 77:5-78:2; *Gov'ts Opp'n* Attach. 11, *Letter from Attorney Villa to Darlene Emerson* (Jan. 18, 2008) (*Acceptance Letter*). The January 18, 2008 letter reflects Mr. Stone's then view of his downloading child pornography. *Id.* at 1-2. After receipt of the letter, PO Emerson recommended that the Court grant Mr. Stone a three-level Guideline reduction for acceptance of responsibility. *Villa Dep.* at 78:3-8.

### k.      Adam Stone and the Truthfulness of the PSR

Once the PSR was complete, Attorney Villa reviewed its contents with Mr. Stone and asked him to make certain that it was complete and accurate. *Id.* at 79:10-15. She told Mr. Stone that the sentencing judge "relies heavily on the information that is contained in the presentence report and that he would use it for imposing sentence in this case." *Id.* at 79:16-22.

### l.      Attorney Villa and the Psychosexual Risk Assessment

Attorney Villa was asked directly why she did not consider getting a psychosexual risk assessment.[7]  *Id.* at 80:6-9.  She responded that "[t]here are a lot of reasons why I didn't."  *Id.* at 80:9-10.  First, she said that "Mr. Stone had consistently been unwilling to speak about his prior history and why he engaged in this conduct."  *Id.* at 80:10-13.  She explained that she had had "a number of times where I've had psychologists and psychiatrists interview clients where in essence, the interview is not usable because a client is not honest with the interviewer."  *Id.* at 80:14-17.  She observed that "there are means of testing that are normal within psychological evaluations to determine whether or not the responses given are in fact honest responses."  *Id.* at 80:18-21.  She explained that "when I have a client who is otherwise quite unwilling to be honest or disclose what was happening, those are clients that I'm less likely to obtain psychological evaluations for because by and large, I can't use them because they result in invalid results."  *Id.* at 80:22-81:2.

Attorney Villa also mentioned the cost of such an evaluation.  She noted that she does not "have all the money in the world" and that "there are scarce resources as far as expert witness funds for public defenders."  *Id.* at 81:3-5.  She said that in making a determination as to where she is going to spend those funds, she has to assess whether she believes the evaluation is "going to be fruitful."  *Id.* at 81:5-8.

---

[7]      Technically, there are two types of expert examination: a mental health evaluation and a psychosexual risk assessment.  *Villa Dep.* at 122:23-123:10.  During parts of the deposition these two types of examination seem to be used interchangeably.  However, toward the end of her deposition, Attorney Villa explained that she had considered but rejected a mental health examination, but did not consider a psychosexual risk assessment.  *Id.*  Rather than attempt to dice between the two, the Court has tracked the actual testimony in the deposition.

Furthermore, Attorney Villa was aware that "the [G]uidelines had forbidden the use of any type of diminished capacity or psychological information in calculating [G]uidelines." *Id.* at 81:15-18.

She concluded that the better course of action was to argue that the Guidelines were out of line with what the offense was, and to support her argument by noting that "many other courts were beginning to not apply these Draconian guidelines in similar types of cases." *Id.* at 81:19-82:1.

Attorney Villa mentioned that, although she considered obtaining the services of a mental health professional or some sort of psychological evaluation, she had "very little to back it up." *Id.* at 82:4-10. She recalled that the first time she learned that Mr. Stone had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) was during the presentence interview. *Id.* at 82:11-12. Based on her earlier experience, she knew that ADHD could lead to "almost compulsive type behavior" with regard to child pornography. *Id.* at 82:13-20.

Attorney Villa mentioned that the idea of a psychosexual risk assessment did not "come up on my radar screen as far as something that would have been productive in this instance." *Id.* at 82:24-83:4. Her prior experience with risk evaluations had been with "hands-on offenses . . . in the sexual predator commitment context," and she was aware of "a lot of debate as to the reliability of those types of evaluations in specific and whether or not there was [sic] currently scales or methods of determining future risk." *Id.* at 83:8-14. She acknowledged that she "just didn't put them together." *Id.* at 83:14-15.

Attorney Villa recalled "a lot of talk about the Hernandez study from the Bureau of Prisons and that there was a concern that people who had only the child pornography offenses were basically hidden hands-on offenders as well" and "talk that there was this huge undiscovered cadre of people with hands-on offenses that were really—were being prosecuted only for the child pornography." *Id.* at 84:4-12. She noted that after Mr. Stone's case closed, Dr. Hernandez "came back and said that's not what my study really was supposed to do" and "there may be a new category of people who are purely computer child offender[s]." *Id.* at 84:13-22. Attorney Villa described her concern as not merely being that Mr. Stone had masturbated online but also that the "risk assessment perhaps would reveal even worse behavior than what he was accused of." *Id.* at 84:23-85:3.

### m.   The Risk of a Risk Assessment

Attorney Villa addressed the potential downside of obtaining a risk assessment. She explained that she intended to argue at sentencing that "it's not a murder case" and that there is no "physical victim of this case as far as somebody who has been physically touched by Mr. Stone as it would be with a hands-on offense, as it would be with a crime of violence." *Id.* at 86:3-10. She testified that "it would be a lot more difficult to make that very attractive argument if it were a hands-on offense." *Id.* at 86:11-14.

In addition, she testified that, if the expert had concluded that Mr. Stone represented a medium to high risk of committing another child pornography offense or committing a hands-on offense, "[t]here are always ethical limitations that occur

if I think that I know something that I'm misrepresenting to the court because candor towards the court as well as protecting my client are two different things." *Id.* at 87:12-15.

Attorney Villa noted that there was an "ethical limitation of keeping the fact that my client was having a very difficult time accepting responsibility from the court." *Id.* at 87:16-19. She had no "problem with the fact that he got to a place where we sat down together and could present a statement that was accepted as acceptance." *Id.* at 87:16-21. She commented: "Even though then he tries to back away from it, he doesn't. Publicly, he doesn't." *Id.* at 87:22-23.

At the same time, she conceded, "I am affected by what I know about my clients and that can affect what I am willing or not willing to present to the court as far as what arguments I make." *Id.* at 87:24-88:2. She explained that, in her mind, she "probably would have made a dichotomy between a hands-on offense and a new child pornography offense." *Id.* at 88:10-13. She observed that, even when there is a risk of a new child pornography offense, "there's a lot of supervision that would account for that risk." *Id.* at 88:14-17. Yet if she were to learn about a hands-on offense through a psychosexual risk assessment, she would have had "a very human reaction and would have a hard time arguing" for an extended period of supervision. *Id.* at 88:20-21.[8]

---

[8]     Attorney Villa agreed that if she decided to use a retained expert at Mr. Stone's sentencing and if the expert relied on material she provided, she would have been required under Federal Rule of Criminal Procedure 16 to turn that information over to the Government. *Villa Dep.* at 92:22-93:3. Furthermore, she agreed that if she had listed a defense expert, the Government would likely have obtained its own expert on the same subject matter. *Id.* at 93:4-9. However, Attorney Villa testified that, in making her decision not to obtain a psychosexual risk assessment, she did not recall being concerned with a potential battle between experts at sentencing. *Id.* at 94:6-15. Mindful of the need

Attorney Villa summarized her decision by testifying that "[m]ostly [what motivated it] was just the fact that he was minimizing with me. I did not see him acting in any other—in any other method and so that if it just came back as being minimizing, that wasn't going to help him" and it could have hurt him. *Id.* at 94:11-17.

### n.  What Attorney Villa Did Not Know

Attorney Villa confirmed that to gather personal information, she sat down with Mr. Stone and obtained a personal history. *Id.* at 95:3-7. Despite doing so, she did not learn that he had been molested at age fifteen, that he had been addicted to painkillers, that he had been homeless, or that he and his fiancée had engaged in role playing and had had sex in public places. *Id.* at 94:18-97:15.

### o.  Psychosexual Risk Assessments in the District of Maine

Attorney Villa testified that at the time of Mr. Stone's sentencing, she was unaware of any defense counsel in the District of Maine using a psychological or mental health expert in connection with a child pornography sentencing. *Id.* at 137:15-19. As of the date of her deposition—November 29, 2011—Attorney Villa was aware of only one other District of Maine case since Mr. Stone's sentencing where a psychosexual risk assessment had been used by defense counsel at sentencing. *Id.* at 138:8-139:4.

### p.  Attorney Villa's Reasoning: A Summary

---

to avoid providing a post hoc rationale for Attorney Villa's decisions, the Court has not considered this part of her deposition.

During her deposition, Attorney Villa explained in detail why she had not obtained an expert evaluation of Mr. Stone and the Court finds that her decision was based on a number of factors. The primary reason was that she was worried that Mr. Stone had not told her the truth about his background and his sexual interest in children. However, there were a number of secondary reasons: (1) the danger that an expert evaluation might reveal more significant misconduct by Mr. Stone, including hands-on offenses, and would ethically or practically restrict the available arguments at sentencing; (2) her experience with the sentencing judge's cool response to psychological studies in diminished capacity cases; (3) Mr. Stone's revelation in his January 18, 2008 letter that he had traded images, raising the potential for a significant sentencing enhancement; (4) Mr. Stone's insistence in his January 18, 2008 letter that he had accessed the child pornography for non-sexual reasons, possibly implicating the three-level reduction for acceptance; (5) her concern that if Mr. Stone was not truthful with the psychologist, the expert report would have been useless; (6) the cost of such an evaluation; (7) the Guidelines' disallowance of downward departures based on diminished capacity in child pornography cases; and (8) the lack of precedent for offering psychosexual risk assessments at child pornography sentencings in the District of Maine.

### 2.   Adam Stone's Limited View of Attorney Villa's Reasoning

In his Objection to the Magistrate Judge's Recommended Decision, Mr. Stone seeks to significantly restrict Attorney Villa's rationales and claims that Attorney's Villa's reasoning can be reduced to only three justifications: (1) his minimization; (2)

financial constraints; and (3) skeptical audience.  *Pet'r's Objection* at 10.   He then maintains that any reference to justifications other than these three amounts to forbidden post hoc rationalization.   Mr. Stone discards Attorney Villa's other rationales as "hypothetical" and stresses in bold one of her responses:

> **Those were not—I don't recall that that was part of what I was concerned with.   Mostly it was just the fact that he was minimizing with me.   I did not see him acting in any other—in any other method and so that if it just came back as being minimizing, that wasn't going to help him.**

*Id.* at 9 (quoting *Villa Dep.* at 94:6-15) (emphasis in original).

The Court rejects Mr. Stone's attempt to so narrowly define Attorney Villa's thinking.   The Court does not interpret Attorney Villa's response in which she emphasized her concern about his minimization as a disavowal of her other concerns; indeed, she testified that there were "a lot of reasons" why she did not consider getting a psychological evaluation.   *Villa Dep.* at 80:10.   Moreover, Attorney Villa's response followed a lengthy set of questions in which the Assistant United States Attorney (AUSA) suggested a number of other rationales, most involving the scope of the information supplied to an expert, the discoverability of such evidence, the risk that the Government would hire its own expert, and other similar issues.   *Id.* at 89:3-94:5.   However, to her credit, even though the prosecutor suggested rationales that could have supported the adequacy of her defense, Attorney Villa declined to adopt them.   *Id.* at 94:6-11.   Instead, she reiterated that "[m]ostly" it was Mr. Stone's minimization that deterred her from obtaining an

evaluation; she did not say that the other explanations that she had offered (as opposed to those offered to her by the AUSA) were illegitimate.

### 3.    Adam Stone's Lack of Candor

Mr. Stone concedes that Attorney Villa's primary justification for not obtaining a mental health evaluation was her concern about his lack of candor.  He argues, however, that this concern "does **not** provide a sound basis for failing to at least investigate mitigating psychological evidence."  *Pet'r's Objection* at 11 (emphasis in original).  Of course, Mr. Stone is in a difficult position because, as it turned out, Attorney Villa's suspicions about his lack of candor turned out to be fully justified.  The personal history that Mr. Stone gave to Attorney Villa and told the Court was accurate was in fact—at least according to the history in Dr. King's report—inaccurate.

Mr. Stone argues that "counsel's mere suspicion that investigation will turn up something bad is not ground to avoid that investigation altogether."  *Id.* at 11. However, in this case, Attorney Villa thought (correctly as it turned out) that Mr. Stone was not telling her the truth about his background and sexual attitudes.  She was also aware of studies that suggested that people convicted of viewing-only offenses, when they come clean about their past, may confess to hands-on sexual contact, and she believed that psychologists have methods of eliciting the truth from their clients and detecting lies.  Sensing that her client was lying to her, Attorney Villa was worried that a psychological evaluation could have revealed a hands-on offense or other information that would have been compelling evidence that Mr.

Stone in fact presented a risk of harm to children. The question then would be how that knowledge would affect her ability to advocate on Mr. Stone's behalf at sentencing. The PSR in this case contained scant information about Mr. Stone's background. It listed no criminal convictions; it referred to two outstanding warrants from the commonwealth of Massachusetts for larceny charges, which Mr. Stone said were no longer valid. PSR ¶ 26. The offender characteristics portion of the PSR described a happy childhood, a close relationship with both parents, some difficulties in school from being typecast as a geek, graduation from high school with further study in the Jobs Corps, continued employment, no mental or emotional problems, and a long-term girlfriend. *Id.* ¶¶ 27-29. The PSR stated that Mr. Stone drank alcohol only socially and that he had used marijuana only four times in his life. *Id.* ¶ 30.

Assuming that Mr. Stone would have told a psychologist before sentencing in 2008 what he told a psychologist after sentencing in 2010, Attorney Villa would have learned that his background was much more complicated. When he was fifteen, he was sexually assaulted by a thirty-year-old man in the bathroom of his home. *King Report* at 4. After graduating from high school, he attended Wentworth Institute of Technology but stopped going after two weeks. *Id.* at 5. When he stopped going to classes, his parents kicked him out of the house and he lived in a tent in the woods about a mile from their home. *Id.* He started getting in trouble with the law and accumulated charges (but no convictions) for breaking and entering, grand larceny, and forgery. *Id.* As part of a plea agreement, he agreed to

enlist in the Army, but he was discharged four months into his service after injuring his knee. *Id.* Upon his return home, he worked in a liquor store and was fired for stealing money, resulting in a charge of grand larceny. *Id.* Mr. Stone reported that the charge was "tried with no conviction." *Id.*

He spent ten weeks in Utah at a wilderness program and then entered the Elan School for troubled teenagers in Maine. *Id.* at 6. After he left Elan, he joined the Jobs Corps, which led him to Aroostook County, Maine. *Id.* Regarding substance abuse, the King Report confirms his limited use of alcohol, but says that he "started smoking marijuana in high school and used the drug on occasion." *Id.* After June 2005 when the FBI seized his computer, he smoked marijuana about twice a week until he was incarcerated. *Id.* He also said that he was addicted to pain pills that had been prescribed to him after his knee surgery in 2003 and that he took the pills for about three years. *Id.* at 6-7.

In some instances, the information in the King Report amplifies the contents of the PSR, but there are some direct contradictions. For example, the description of Mr. Stone's drug use in the PSR cannot be reconciled with Dr. King's description of his drug use; there is an apparent discrepancy between the criminal histories in the PSR and the King Report; and the PSR does not mention the sexual assault. Of course, Attorney Villa did not have the King Report when she represented Mr. Stone and therefore the contents of the report are only an example of what may have been revealed if she had requested a psychological evaluation.

A key question is what impact any additional information—favorable or otherwise—discovered by means of a psychological evaluation would have had on Attorney Villa's defense of Mr. Stone at sentencing. However, Mr. Stone's argument suffers from a flawed premise. He dismisses Attorney Villa's concerns about the potential that an expert report would reveal deleterious background information or an unfavorable expert opinion by saying in effect that if the report did not prove useful, Attorney Villa could simply have buried it in her file. In other words, Attorney Villa should have ordered the report because her client had "nothing to lose" by her doing so. Even if Mr. Stone were correct that Attorney Villa had nothing to lose by obtaining a psychological exam—and the Court rejects this contention—that would not clinch his Sixth Amendment case, given the Supreme Court's statement in *Knowles v. Mirzayance*, 556 U.S. 111 (2009), that "[t]his Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims." *Id.* at 122. It is instead the general *Strickland* standard of "reasonably effective assistance" that must control. *See id.* (citing *Strickland*, 466 U.S. at 687).

### 4. Defense Counsel's Obligation of Candor to the Tribunal

Among Attorney Villa's stated concerns was the possibility that a psychological evaluation could have generated information about her client that would have limited her ability to advocate on Mr. Stone's behalf, given her professional obligation of candor toward the tribunal. *Villa Dep.* at 86:11-88:21. Attorney Villa's ethical obligations play out in different ways.

### a.     The Contents of the Evaluation and the PSR

If Attorney Villa had knowledge of a different history from her client than was contained in the PSR, she could not have stood by and allowed Mr. Stone to maintain that the PSR was accurate.   The colloquies among the Court, defense counsel, and Mr. Stone at both the Rule 11 hearing and the sentencing made it clear that it was essential that the contents of the PSR be accurate.   At his Rule 11 hearing on January 9, 2008, the Court expressly advised Mr. Stone about the reason for the PSR and the need for it to be accurate:

> THE COURT:  What's going to happen between now and the time of your actual sentence is that the probation officer will come by, and he or she will meet with you, and he or she will interview you, and ultimately, a report will be prepared that will help me better understand who you are and how you got here.  You will have a chance to review that report.
>
> What I want you to know, Mr. Stone, is I'm going to rely on the contents of the report in part to determine the right sentence to be imposed upon you.  So it is essential that the information in the report be accurate and true in all its detail.  You're represented by a very fine lawyer.  Ms. Villa will bring to my attention any issues, both legal and factual, that are necessary to resolve, but you are the person who knows your own life.  So we're all going to rely on you to make sure that the facts about your life are accurate and true in all their detail.  Do you understand?
>
> THE DEFENDANT:  Yes, Your Honor.

*Tr. of Proceedings* at 29:17-30:7 (ECF No. 18).  At Mr. Stone's sentencing hearing on April 7, 2008, the Court engaged in the following colloquy with counsel and Mr. Stone regarding the contents of the PSR:

> THE COURT:  Ms. Villa, has your client received a copy of the written presentence investigation report in this case?

MS. VILLA:  He has.

THE COURT:  Have you had enough time to discuss the contents of the report with him?

MS. VILLA:  We have, yes.

THE COURT:  Mr. Stone, have you read the report in its entirety?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you had enough time to discuss the contents with your lawyer?

THE DEFENDANT:  Yes, I have, Your Honor.

THE COURT:  Do you know and understand everything contained in the report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I want you to understand, Mr. Stone, that to the extent I accept the contents of the report as true, those contents are going to form part of the basis upon which I will determine the sentence to impose upon you.  Do you understand that?

THE DEFENDANT:  Yes, I do, your Honor.

THE COURT:  Knowing that, knowing that the contents of the report may affect your sentence, is there anything set forth in the report you believe is in any way inaccurate or incorrect?

THE DEFENDANT:  No, Your Honor.

*Sentencing Tr.* at 9:22-10:23 (ECF No. 16).  If Attorney Villa knew that Mr. Stone had admitted a different history of substance abuse, for example, she could not have endorsed Mr. Stone's misrepresentations to the Court.  ME. RUL. PROF. CONDUCT 3.3(a)(1), (3).[9]  Mr. Stone appears to recognize this.  *Pet'r's Objection* at 17 ("To be

---

[9]     The Maine Rules of Professional Conduct mandate candor toward the tribunal.  ME. RUL. PROF. CONDUCT 3.3.  Specifically, a lawyer shall not knowingly make a false statement of fact to a

sure, counsel could not have sought to admit a fabricated report or lied to the Court when asked about an admitted one"). It is also true that if Attorney Villa had received the psychological evaluation before the PSR was finalized, she might have been able to correct his earlier misstatements and to avoid this ethical dilemma.

Between the guilty plea and sentencing, Attorney Villa had been involved in delicate negotiations with the PO to assure that the PO would recommend that Mr. Stone receive a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Mr. Stone did not impress the PO when he was interviewed for the PSR and the PSR itself described him as "guarded, defensive and inadequate" in his initial explanation of his criminal conduct. PSR ¶ 7. Attorney Villa directed some of her defense efforts to assuring that the PO recommended the three-level reduction, efforts that ultimately proved successful.

This was a major victory for Mr. Stone. With acceptance, he had a total offense level of 37 for a Guideline range of 210 to 240 months (the upper bound having been reduced from the Guidelines' 262 months to the statutory maximum of 240 months). Without acceptance, he would have had a total offense level of 40 for a Guideline range of 292 to 365 months, reduced to the statutory maximum of 240 months. The Court would have been presented with an advisory Guideline sentence far in excess of the statutory maximum, a fact that may have resulted in the imposition of 240 months, not the 210 months he received.

---

tribunal or fail to correct a false statement of material fact previously made to the tribunal by the lawyer. *Id.* 3.3(a)(1). Furthermore, a lawyer shall not knowingly offer evidence that is false and, if evidence is false and the lawyer comes to know of its falsity, the lawyer must "take reasonable remedial measures, including, if necessary, disclosure to the tribunal." *Id.* 3.3(a)(3).

The psychologist's unearthing of more background information on Mr. Stone, including information that in part contradicted Mr. Stone's recitation of his background to Attorney Villa, would have complicated Attorney Villa's attempts to convince the PO that Mr. Stone merited acceptance. *See Harrington*, 131 S. Ct. at 789-90 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense").

### b.   The Arguments at Sentencing

The greater ethical (and strategic) problem would have arisen if the psychologist had concluded that Mr. Stone did in fact represent a significant risk of reoffending or, even more significantly, if Mr. Stone had admitted to a prior hands-on offense.  Mr. Stone is certainly correct that if Attorney Villa decided not to use the expert, she would not have been required to share that information with the Government.  *Id.* at 15 (citing FED. R. CRIM. P. 16(b)(1)(C)).  But Attorney Villa could not have simply ignored the expert's conclusion and argued that Mr. Stone presented no such risk.  As Mr. Stone points out, Attorney Villa could have presented other arguments that would not have implicated the expert's conclusions; still, her range of ethical arguments would have been narrowed by an adverse report.

What Attorney Villa argued at the sentencing hearing is illuminating.  Attorney Villa attacked the escalating Guideline range in two ways.  First, she made the point that congressionally-directed enhancements do not reflect the considered view of the Sentencing Commission.  *Sentencing Tr.* at 17:7-18:25.  Next,

she pointed to the facts in this case and argued that some of the enhancements that drove up Mr. Stone's Guideline range were not drafted with cases like Mr. Stone's in mind. *Id.* at 18:1-19:23. She contended that there was no evidence "that Mr. Stone is particularly interested in prepubescent or sadomasochistic behavior" and, although she acknowledged he had downloaded child pornography, she maintained that he was interested in pornography in general and that there was "no indication that there was a targeted focus on any particular kind." *Id.* at 18:1-16. In short, she argued that "the rationale for having those enhancements available just don't seem to fit what happened here." *Id.* at 19:3-5. She emphasized that Mr. Stone's activities were driven by "a lot of fantasy," and the "type of nonthinking activity that, unfortunately, causes a lot of harm." *Id.* 19:18-21. She argued that his activity "isn't the type of focused, predatory activity that I think that causes a lot of concern in this area." *Id.* at 19:21-23.

After some discussion with the Court about whether Mr. Stone actually thought that the person with whom he was dealing was a fifteen-year-old girl, Attorney Villa emphasized the absence of any evidence of hands-on contact on the part of Mr. Stone. *Id.* at 28:2-3 ("That is psychologically abusing them. It's different than actually laying hands on her"). The Court agreed that in Mr. Stone's case "[t]here's no indication here that he ever actually touched anybody or that he participated in the production of child pornography." *Id.* at 28:4-6. Accepting this characterization, Attorney Villa addressed "what then to do about that." *Id.* at 28:10-11. She urged the Court to use a long period of supervised release to avoid

57

incarcerating someone "who has not touched anybody." *Id.* at 28:14-29:22. She criticized the federal system as being "out of balance" because in state court persons who commit hands-on offenses "are being punished less harshly simply because they're in state court, rather than in federal court." *Id.* at 30:22-31:8. Finally, she argued that following this investigation, Mr. Stone had changed his life, had maintained a stable and loving relationship, and had the support of his parents, of his fiancée, and of her parents. *Id.* at 31:21-32:13.

Despite Mr. Stone's earnest contention that Attorney Villa could have presented a "carefully crafted" argument regarding the risk of re-offense, the Court is not convinced. *Pet'r's Objection* at 18. Mr. Stone says that even in the face of an expert report that concluded he posed a high risk of re-offense due to his limited insight, ADHD, and history of substance abuse, Attorney Villa could have emphasized his absence of convictions, good behavior since the investigation, and support system as factors that lessened his recidivism risk. *Id.*

All true, but it is equally clear that, if she had learned from an expert report that he had committed a hands-on offense, Attorney Villa could not have ethically argued to the Court that he had not. The Court itself was under the impression that he had not committed a hands-on offense. *Sentencing Tr.* at 28:4-5 ("There's no indication here that he ever actually touched anybody"). Whether Attorney Villa would have been required to correct the Court's misimpression is less clear, but Attorney Villa certainly could not have stressed to the Court, as she did during her

sentencing argument, that Mr. Stone had committed no hands-on offenses, if she knew he had.

Furthermore, the argument, however "carefully crafted," could have imploded at the hearing. As the sentencing hearing transcript reveals, Attorney Villa could not control the Court's inquiries, and if the Court had directly asked a question about prior hands-on offenses, she could not have lied in response. A revelation to the Court at the sentencing hearing that her client had committed a hands-on offense would have had potentially devastating consequences for Mr. Stone.

Finally, much of what Attorney Villa actually argued at sentencing would not have been available to her. She would have been in a difficult position to argue that Mr. Stone's conduct in committing this crime was mere fantasy, that the Guidelines' concern for harm to children did not meet the facts in his case, and that the absence of any evidence of hands-on conduct favored supervised release over incarceration.

In sum, the Court rejects Mr. Stone's contentions that there was no downside risk in obtaining an expert evaluation and that by failing to do so, Attorney Villa fell short of *Strickland* standards.

### 5.    A Skeptical Audience

Another of Attorney Villa's concerns was that in the past the sentencing judge "was not very receptive to" psychological reports. *Villa Dep.* at 49:4-7. Typically, the context for such reports was United States Sentencing Guideline (U.S.S.G.) § 5K2.13, which provides a policy statement disapproving downward departures for diminished capacity in child pornography cases. *Id.* at 49:14-20.

Based on this experience, Attorney Villa was worried that the sentencing judge would greet with skepticism a psychological assessment such as the one Dr. King drafted.  Of course, Mr. Stone is correct when he says "[i]t is not appropriate to presume that the judge would penalize Stone simply for presenting evidence bearing on [18 U.S.C. § 3553(a) factors]."  *Pet'r's Objection* at 19.  At the same time, it is not unreasonable for counsel to concentrate the focus of the defense on what had actually worked before the same sentencing judge in other cases and to forego what had not.

### 6.    Guidelines Issues

During her deposition, Attorney Villa discussed three Guidelines issues that could have been affected by a psychological evaluation: (1) the trading images enhancement; (2) loss of the acceptance of responsibility reduction; and (3) the lack of a diminished capacity downward departure.

### a.    Trading Images: U.S.S.G. § 2G2.2(b)(3)(B)

Attorney Villa was aware that the Guidelines included a sentencing enhancement for the trading of child pornography.  *Villa Dep.* at 59:11-12; *see* U.S.S.G. § 2G2.2(b)(3)(B) (providing for a five-level increase if the offense involved "[d]istribution for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain").  In his January 18, 2008 letter, Mr. Stone admitted trading images.  *Stone Letter* at 2 ("I just saved them to trade with people online.  The way it worked was I give someone a few pics, then they give me a few pics").  Mr. Stone managed to avoid the imposition of this enhancement.  *See PSR* at 6-7.  If this five-

level enhancement had applied, Mr. Stone's Guideline range would have jumped from 210 to 262 months to 360 to life, capped by the statutory maximum of twenty years. If Mr. Stone admitted to the psychologist that he had traded images, and the psychologist had included it in his report, Attorney Villa would have faced the choice of revealing this new information to the PO (and running the significant risk that his Guideline range would dramatically increase) or not using the evaluation at all. Her strategic decision not to face that dilemma was not unreasonable.

### b.      Loss of Acceptance

A second concern for Attorney Villa was whether Mr. Stone would be accorded acceptance of responsibility under U.S.S.G. § 3E1.1. *Villa Dep.* at 58:24-59:5. To gain acceptance, he was required to "clearly demonstrate[ ] acceptance of responsibility." U.S.S.G. § 3E1.1(a). On this issue, the First Circuit has stressed that the defendant must "evince remorse." *United States v. Tuesta-Toro*, 29 F.3d 771, 777 (1st Cir. 1994). Because she was worried about his truthfulness, Attorney Villa had reason to be concerned about what Mr. Stone might say to the psychologist. As it turned out, he made a poor impression on the PO and Attorney Villa managed to get an acceptance recommendation only after she stopped the presentence interview and subsequently drafted a carefully-worded letter to the PO, manifesting remorse. *Villa Dep.* at 76:17-77:16.

Again, if Mr. Stone had said to the psychologist what he had been saying to Attorney Villa about his possession of child pornography being non-sexual, the contents of the report, if revealed, might well have resulted in the loss of

acceptance.  For Mr. Stone, the loss of acceptance would have resulted in a three-level increase, yielding a total offense level of forty and a Guideline range of 292 to 365 months, far beyond the statutory maximum of 240 months.  If he had both lost acceptance and received the five-level increase for trading images, his total offense level would have increased to forty-five, which is beyond the sentencing table grid and the Guideline sentence would have been life, capped by the statutory maximum.

Assuming that a referral to a psychosexual expert would have resulted in something like the King Report, even the King Report itself contains some information that could have resulted in a denial of acceptance.  When Mr. Stone pleaded guilty, he admitted the contents of a Prosecution Version of the Offense.  *Prosecution Version of the Offense* (ECF No. 4).  After describing the offense, the Prosecution Version stated that "[a] representative sample of the images from the photo albums is attached under seal as Exhibit A.  Exhibit A-1 is an image of a known child from the Heather series.  Exhibit A-2 is an image of a known child from the Misty series."  *Id.* at 3.

During the Rule 11 colloquy, the Court made certain that Mr. Stone had not only read the Prosecution Version, but also had actually viewed the samples of child pornography attached to the Prosecution Version.  *Tr. of Proceedings*, 9:22-17:5; 22:16-18; 23:4-25:9 (ECF No. 18).  During the plea colloquy, even though Mr. Stone could not state that the specific images attached to the Prosecution Version were within his photo album, he acknowledged that the Government could prove that

these images were in his photo album, that the images were similar to the types of images that were on his computer, and that he provided these images to the detective in Illinois. *Id.* at 24:21-25:16. During his sentencing, the Court characterized the two images as "abhorrent," one in particular "shows a very young girl, maybe 5 years old or so, engaged in sex with an adult male. The picture depicts her placing her hands over her eyes as if to block out what was happening to her." *Sentencing Tr.* at 43:18-23. The Court described the image as "simply haunting." *Id.* at 43:23-24.

Despite his admission during the Rule 11 hearing that these images were "[a] representative sample" of what was found in his photo albums, Mr. Stone informed Dr. King that he was "not interested" in images of children engaging in sexually explicit conduct. *King Report* at 8. Instead, he insisted that "he sought pictures of developed teenage girls." *Id.* He explained that he posted numerous pornographic images on his albums in order to receive images from others. *Id.* Dr. King accepted Mr. Stone's latest description of his sexual interests as true and commented that "[i]t is widely accepted that adult male sexual interest in developed teenage girls is not abnormal as most adult males are attracted to the aforementioned." *Id.* at 11.

But Dr. King's conclusions conflict with the Prosecution Version itself, which describes the haunting images of very young girls as a "representative sample" of Mr. Stone's child pornography albums. *Prosecution Version* at 3. Even assuming Dr. King is correct in saying that normal adult males have a sexual interest in developed teenage girls, this does not explain Mr. Stone's willingness to collect a

large volume of sexualized images of very young children in order to obtain images of fifteen-year-olds.[10]   The question remains: if Mr. Stone was interested only in developed teenage girls, why did he have such a large collection of pornography involving young children?

Furthermore, his conclusions do not explain why Mr. Stone sent the images in these albums, including some abhorrent images, to a person he thought was a fifteen-year-old girl.   Mr. Stone asked "brownhairedgirl_1" whether she had "any pictures of other girls," but the detective responded that "she did not." *Prosecution Version* at 1.   Nevertheless, on February 16, 2005, Mr. Stone asked "brownhairedgirl_1" to view his photo album, which contained "images of minors engaged in sexually explicit conduct" and on March 4, 2005, and April 1, 2005, he sent "brownhairedgirl_1" a link to additional albums containing similar images of child pornography.   *Id.* at 2-3.   The Court viewed and still views Mr. Stone's conduct as inexplicable and Dr. King's report does not help explain it.

---

[10]      In the Court's experience, Mr. Stone's argument is not uncommon but is not commonly convincing.   Defendants charged with possession of child pornography rarely admit they have a sexual interest in young children.   Instead, they contend that they collected pornography involving young children to trade for more permissible images—such as images of sixteen-year-olds, who look like young adult women, or to talk about sex online.   *See Cameron*, 2011 U.S. Dist. LEXIS 24878 at *53.

        This case is an example of why these arguments are typically unconvincing.   As Attorney Villa described it, Mr. Stone had "images of sadism . . . involving children," images of "very, very young children being raped," and images of "very, very young children involved in all sorts of sexual conduct."   *Villa Dep.* at 58:16-23.   Furthermore, Mr. Stone saved these images to a disk and, as Attorney Villa candidly stated, "there is a concern that when you have child pornography saved to disks that it is for the purpose of future reference."   *Id.* at 60:13-15.   During the sentencing hearing, the Court described one of the "representative images": an image of an adult male having sex with a very young girl, perhaps five-years-old, and the young girl has her hands over her eyes presumably to block out what is happening to her.   *Sentencing Tr.* at 43:20-23.   The Court described that image as "simply haunting."   *Id.* at 43:23-24.   For a person to seek out, collect, save, and trade such images—even if the primary purpose is to obtain, as he claims, images of teenage girls—is profoundly disturbing.

In short, Mr. Stone's petition relies on the questionable premise that, having lied before, he has now come entirely clean and would have done so during a psychosexual assessment in anticipation of sentencing.   Faced with a disparity between what Mr. Stone admitted was true at the Rule 11 hearing and what he told the psychosexual evaluator, the Court may have concluded that Mr. Stone was not entitled to the three-level reduction under U.S.S.G. § 3E1.1 because he failed to "truthfully admit[ ] the conduct comprising the offense[ ] of conviction."  U.S.S.G. § 3E1.1, Application Note 1(A).  In the context of a sex offender, a defendant's failure to come to terms with his responsibility for his crime signals the potential for recidivism and can result in the imposition of a harsher sentence.

### c.    Diminished Capacity

To the extent that Attorney Villa was aware of facts that could have supported a diminished capacity downward departure under the Guidelines, she was also aware that the Guidelines prohibited diminished capacity downward departures for child pornography offenses.  *See* U.S.S.G. § 5K2.13.  Attorney Villa learned about Mr. Stone's ADHD at the presentence interview.  *Villa Dep.* at 82:11-12.   At her deposition, she stated that she was aware that "there could be a correlation between the ADHD and the fact that this appeared to have been just one of those unthinking, absolute -- almost compulsive type of behavior that [she] had seen ADHD clients have previously with regard to child pornography."  *Id.* at 82:15-20.  There is no suggestion that Attorney Villa knew about Mr. Stone's substance

abuse history other than his social use of alcohol and past use of marijuana a total of four times.

Even had she been aware of his true substance abuse history, U.S.S.G. § 5K2.13 prohibits a diminished capacity downward departure for voluntary substance abuse.  *See* U.S.S.G. § 5K2.13 ("[T]he court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants").

### 7.   Uselessness

Attorney Villa's Guidelines concerns are interwoven with her view that a psychological evaluation would have been useless.  Mr. Stone responds that if the psychological report had in fact been useless, there would have been no need for Attorney Villa to share it with the Government and no harm done to the defense. This issue circles back to whether Attorney Villa properly thought the contents of an evaluation could constrain the defense at sentencing.

### 8.   Cost

During her deposition, Attorney Villa expressed a worry about the potential cost of a psychological assessment and suggested that the cost affected her decision not to order one.  In the Recommended Decision, the Magistrate Judge did not emphasize this factor.  *Recommended Decision* at 1-13.  In his objection, Mr. Stone applauds the Magistrate Judge's reticence on this topic, quoting a 1986 case from the Southern District of Florida: "defense counsel's citing expense as a reason to consult another expert is invalid, as this was a court-appointed case." *Pet'r's*

*Objection* at 10 n.2 (quoting *Troedel v. Wainwright*, 667 F. Supp. 1456, 1461 (S.D. Fl. 1986)).

It is certainly true, as Mr. Stone claims, that the First Circuit has stated that "[d]ue process requires that, where the defendant's mental condition is relevant to his criminal culpability and to the punishment he might suffer, the government provide to indigent defendants expert psychiatric testimony at the sentencing phase." *United States v. Mastera*, 435 F.3d 56, 62-63 (1st Cir. 2006) (internal punctuation omitted). However, as the First Circuit observed, the premise is that the defendant's mental condition is "relevant to his criminal culpability and to the punishment he might suffer," and here, the Guidelines prohibit downward departures for diminished capacity for the type of crime Mr. Stone committed and for the voluntary use of drugs. *See* U.S.S.G. § 5K2.13.

Moreover, due process does not require that the government fund the retention of a psychological expert in every criminal case; in *Mastera* itself, the First Circuit affirmed a trial judge's denial of a request for such funds in the face of a defendant's contention that "a psychological evaluation was necessary for him to prepare an adequate defense, since he is an alcoholic, suffered from sleep difficulties and racing thoughts, allegedly had mental health problems while incarcerated in the past, and had endured childhood abuse." *Id.* at 62-63. As the First Circuit has observed, "[t]he C[riminal] J[ustice] A[ct] does not afford access to psychiatric experts on demand." *United States v. Quinones-Medina*, 553 F.3d 19, 25 (1st Cir. 2009).

More recently, in the context of a habeas petition, the Supreme Court has emphasized that "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington*, 131 S. Ct. at 789; *see also Rompilla v. Beard*, 545 U.S. 374, 383 (2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste"). Here, Attorney Villa reasonably believed that further investigation into Mr. Stone's psychology would accomplish little, and therefore could appropriately consider the cost of a psychological exam.

Furthermore, although Mr. Stone has attacked Attorney Villa's stated concern for cost, he has not presented any evidence on the issue. The record does not disclose how much Dr. King's evaluation or one like it would have cost. In short, Mr. Stone presented no evidence to sustain his burden on this point.

### 9.   Psychological Reports for Other Defendants

During her deposition, Attorney Villa testified that to her knowledge as of the date of Mr. Stone's sentencing, no defense counsel in a child pornography case in the District of Maine had used a psychological or mental health expert in connection with sentencing. *Villa Dep.* at 137:15-19. As of November 29, 2011, the date of her deposition, she was aware of only one case in the District of Maine where a psychological or mental health expert had been used in a child pornography sentencing. *Id.* at 138:8-139:4. Mr. Stone congratulates the Magistrate Judge for refusing to look to local practice norms as a justification for Attorney Villa's failure

to employ a psychological or mental health expert. *Pet'r's Objection* at 10 n.2. However, the *Strickland* standard contemplates an "objective standard of reasonableness" measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. If psychosexual risk assessments were standard operating procedure in the District of Maine for the defense of child pornography cases, Mr. Stone could justifiably have argued that a failure to obtain one is evidence of a failure to meet this objective standard. The obverse is also true.

### 10.    Mr. Stone's Caselaw

In his objection, Mr. Stone cites a number of cases where courts have criticized defense counsel's failure to interview potential witnesses or present expert evidence to rebut the Government's expert. *Pet'r's Objection* at 11 (citing *Duncan*, 528 F.3d at 1235; *Avila v. Galaza*, 297 F.3d 911, 920 (9th Cir. 2002)). This Court has no quarrel with Mr. Stone's general proposition—at least as it applies to third party witnesses in capital cases. However, when a defense lawyer is dealing with her own client, both the dynamic and the consequences are markedly different, particularly in a sex offense. In *Duncan* and *Avila*, defense counsel failed to investigate evidence that someone other than the defendant committed murder and attempted murder, respectively—evidence that thus could have raised a reasonable doubt as to the defendants' guilt. *See Duncan*, 528 F.3d at 1225; *Avila*, 297 F.3d at 914. The value of such evidence was substantial, and defense counsel's failure to investigate it accordingly unreasonable. Here, by contrast, the evidence Attorney Villa failed to investigate would not have raised any doubt as to Mr. Stone's guilt.

Whether the new information would have benefited Mr. Stone at sentencing is more difficult, as the Court has discussed, and it is possible the new information could have hurt Mr. Stone's plea for leniency. The reasonableness of an attorney's decision not to investigate must be measured in part by the potential value of the evidence not investigated, and in this case—unlike in the cases Mr. Stone cites— that evidence could have been marginally beneficial or potentially detrimental.

Mr. Stone cites *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2004), where the Sixth Circuit found that a defense attorney's performance, including his failure to obtain a psychological assessment, violated *Strickland* standards. *Pet'r's Objection* at 11-12 (citing *Hamblin,* 354 F.3d at 491-92). *Hamblin*, however, was a capital case, and the defense lawyer performed no investigation at all to prepare for the penalty phase of the trial. In the words of the appellate court:

> [Defense counsel] did not prepare for the penalty phase of the bifurcated trial. He did not try to find out any family history or any facts concerning defendant's psychological background and mental illness, nor did counsel seek any advice or expert consultation for the penalty phase of the case. Despite a large body of mitigating evidence, counsel did nothing to discover what was available or introduce it in evidence.

*Id.* at 485. The defense lawyer "admitted in his affidavit that he did essentially nothing by way of preparation for the penalty phase" of the trial; he "did not present the jury with any mitigating evidence, therefore the closing statement consisted of a plea for mercy." *Id.* at 490. As it turned out, the defendant had had a horrific upbringing and "signs of mental disorder" since his teenage years. *Id.*

70

*Hamblin* is not persuasive authority for Mr. Stone's case.  In *Hamblin*, the defendant faced the death penalty.  Accordingly, the *Hamblin* Court looked to American Bar Association (ABA) guidelines for counsel in death penalty cases to define the "prevailing professional norms" against which counsel's performance should be measured.  *Id.* at 486-88.  The obligation of counsel to investigate and present mitigating evidence was detailed in the ABA guidelines, quoted at length by the Court.  *See id.* at 487 n.2.  But *Hamblin*'s discussion of the obligation to investigate mitigating evidence must be limited to capital cases, since "the sentences in a capital case must consider in mitigation, anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant."  *Id.*  The Court is leery about extrapolating principles in death penalty cases to non-capital cases like Mr. Stone's.

Moreover, in *Hamblin*, unlike in this case, defense counsel could not have been concerned that if his investigation revealed harmful information about the defendant, he could be punished more severely.  Here, by contrast, the psychosexual evaluation may have presented information that could well have constrained the permissible range of defense counsel's argument and could have increased Mr. Stone's sentence.

### 11.    Summary: Performance

In summary, the Court finds that Mr. Stone failed to meet his burden to establish that Attorney Villa's failure to obtain a psychological evaluation constituted deficient performance under the standard in *Strickland*.

### 12. Prejudice

As the Court concludes that Adam Stone has not demonstrated that Attorney Villa's performance was deficient under the objective reasonableness standard of *Strickland*, it need not undertake a separate analysis of the prejudice prong of the *Strickland* analysis. The Court notes, however, that in this case the two prongs are intertwined. The Court's determination that Attorney Villa's decision not to retain a psychological expert was reasonable is based in part on the Court's ratification of Attorney Villa's determination that a psychological exam was unlikely to benefit Mr. Stone at sentencing, particularly given U.S.S.G. § 5K2.13. Likewise, there is no "reasonable probability" that engaging a psychological expert before sentencing would have benefited Mr. Stone, and therefore no prejudice. *See Harrington*, 131 S. Ct. at 787.

### D. Objections to the Recommended Decision

To complete the analysis, the Court turns to Mr. Stone's specific objections to the Recommended Decision.

### 1. "Significant Factual Disputes"

Mr. Stone's first objection is to the Magistrate Judge's statement in the Recommended Decision that "[t]here do not appear to be any significant factual disputes, but rather the debate turns on the significance of what did or did not occur." *Pet'r's Objection* at 3 (quoting *Recommended Decision* at 1). Mr. Stone argues that there are in fact "significant factual disputes" and that the Government "took extensive liberties" with defense counsel's deposition testimony. *Id.* The

Court overrules this objection. The Magistrate Judge merely set forth a brief (five paragraph) overview of the facts in the case from its inception to the filing of the motion and there was (and is) in fact no dispute about what she described. It is apparent from the rest of the Magistrate Judge's opinion that she was aware that Mr. Stone and the Government did not agree on a number of the salient facts underlying his petition.

### 2.    The Government's "Extensive Liberties"

Mr. Stone's next objection is that the Government took "extensive liberties" in describing Attorney Villa's deposition testimony. *Pet'r's Objection* at 3.

### a.    Consultation with Other Lawyers

In her Recommended Decision, the Magistrate Judge wrote: "Although she had represented hundreds of defendants, her first child pornography case was Stone's and so she consulted with other attorneys experienced in such cases." *Recommended Decision* at 7. Mr. Stone accuses the Magistrate Judge of parroting the Government's memorandum, which he claims misrepresented Attorney Villa's testimony. *Pet'r's Objection* at 4. In its memorandum, the Government says that Attorney Villa's "time sheets reflected the eleven hours she spent on [Mr. Stone's] case, including consultation with her supervisor, Federal Defender David Beneman, and other attorneys familiar with child pornography cases." *Gov't's Opp'n* at 22. The Government cites Attorney Villa's transcript from pages twenty-nine through thirty-two and deposition exhibit two, her timesheets. *Id.*

The Court carefully reviewed Attorney Villa's timesheets and agrees with Mr. Stone that there is no clear indication on Attorney Villa's timesheets that she consulted another attorney at least through the date of sentencing. *See Gov't's Opp'n* Attach. 3 at 1-3 (*Timesheet*).  However, after carefully reviewing Attorney Villa's deposition testimony, the Court does not find that she did not discuss child pornography defense issues with other criminal defense counsel during her representation of Mr. Stone.  Although Attorney Villa's level of expertise and experience both as a defense counsel and in particular in child pornography cases was a major topic during her deposition, her memory of the case had been compromised by the passage of time and the questions and answers on this subject were imprecise.  For example, once Attorney Villa revealed that Mr. Stone's case was her first child pornography defense, she was asked whether she consulted with any other lawyer about the defense of child pornography cases and she responded, "I do not recall whether I did or didn't.  I may have." *Villa Dep.* at 32:2-4.  The questioning continued:

> Q.  In order to prepare to represent someone in a child pornography prosecution like Mr. Stone or in connection with your continuing representation of him leading to sentencing, did you talk with anyone about representing a defendant in a child pornography prosecution?
>
> A.  Did I speak to anyone?  I have a hard time recalling because it's been a while, and I cannot say—I know that I've spoken with people, I just can't put it in time.  And so I know that I've spoken with panel attorneys about child pornography cases.
>
> I know that I have spoken with other defenders about child pornography cases.  I know that I—I believe just reviewing my closing notes spoke with probation about specifically child pornography cases

> for Judge Woodcock.  How and when and what, I would not be able to
> give you details.

*Id.* at 32:9-25.  Later on, she was asked about a closing memorandum that she filed

at the end of the case and her statement that she had "heard that Woodcock tends

to sentence above the bottom in child pornography cases."  *Id.* at 47:12-22.  When

asked where she had heard this information, she replied, "I would not have heard it

from Mr. Beneman, I believe, because he I don't think practices regularly in front of

Judge Woodcock.  I think I may have also heard that from other panel attorneys."

*Id.* at 47:23-48:4.

Attorney Villa's lack of precision is understandable.  She was deposed on

November 29, 2011, *Villa Dep.* at 1, and she was being asked about events between

April 23, 2007, when she first began to represent Mr. Stone, and April 7, 2008,

when he was sentenced.  *See Timesheet* at 1-3.  That Attorney Villa would not have

discussed this Judge's sentencing patterns with Federal Defender Beneman is

logical because Attorney Beneman, who works in the same Federal Defender Office,

rarely appears before this Judge.  At the same time, lawyers talk to each other all

the time, criminal defense lawyers no less than others, and it would hardly be

surprising if she had discussed the defense of child pornography cases with other

criminal defense counsel.   Nor would these informal attorney-to-attorney

conversations likely appear in Attorney Villa's timesheets.  Based on this testimony,

the Court does not find that Attorney Villa did not discuss child pornography

defense issues with other criminal defense counsel during her representation of Mr.

Stone, and overrules Mr. Stone's objection to this portion of the Magistrate Judge's decision.

### b.        Strategic Justifications

Next, regarding Attorney Villa's decision not to obtain a psychosexual evaluation, Mr. Stone contends that the Government misled the Magistrate Judge by asserting facts that were not part of the record and he again accuses the Magistrate Judge of merely parroting the Government's unsupported contentions. *Pet'r's Objection* at 4-7. Mr. Stone points to the Government's memorandum where it argued:

> Second, in [counsel]'s experience, the judge before whom Stone would be sentenced had a reputation for assigning little value to psychological evaluations.   Competent counsel could reasonably conclude that to seek an evaluation that would only serve to put off the sentencing court was a strategy in danger of backfiring. A third reason [counsel] could reasonably decide not to seek a risk evaluation was Stone's persistent refusal to be honest with her, the presentence investigator, and possibly the court as well.   Even in his examination by his own expert, prepared in anticipation of the instant § 2255 proceedings, more than 2 years after he was sentenced, Stone has taken positions that are inconsistent with what he told (or refused to tell) both [counsel] and the presentence investigator. . . . As [counsel] testified at her deposition, her prior experience with clients who prevaricated made mental health evaluations of extremely limited value, and could even make the client's situation worse.   At an evaluation, Stone might have provided incriminating information that crippled [counsel's] ability to make certain sentencing arguments related to the risk of recidivism and might even have been so damning to require her as a matter of ethics to disclose the results of the evaluation to the prosecutor, who would likely use it to Stone's detriment.

*Id.* at 4-5 (quoting *Gov't's Opp'n* at 44-46).   He then recites the Recommended Decision:

> [Counsel] frequently questioned Stone's honesty with her and had no
> reason to believe that Stone would be more forthright in an interview
> with an expert. Despite having numerous opportunities to do so, Stone
> did not provide [counsel] or the probation officer with much of the
> background information he reported to Dr. King. . . . Stone's report to
> Dr. King was therefore inconsistent with Stone's statements to
> [counsel], the probation officer, and the Court, because Stone stated at
> his sentencing that he did not believe there was anything inaccurate or
> incorrect in the presentence investigation report. [Counsel] perceived
> some risk in obtaining an expert evaluation because it could have
> revealed other criminal conduct by Stone or resulted in a finding that
> he was likely to re-offend, thus limiting the kinds of arguments
> [counsel] could ethically present to the Court.

*Id.* at 5 (quoting *Recommended Decision* at 7-8). Mr. Stone extensively quotes other

portions of the Recommended Decision discussing whether Attorney Villa's decision

not to obtain a psychosexual risk assessment was a tactical choice:

> [Counsel] felt that Stone was not telling her the whole truth, and she
> worried that an expert evaluation might result in more harm than
> good. [Counsel] did not know whether Stone had committed other
> offenses or whether an expert would find that he was likely to reoffend.
> [Counsel] could not have simply ignored any adverse findings, as Stone
> contends. Such findings would have negatively affected [counsel's]
> ability to advocate the best possible outcome for Stone.
>
> It is impossible to know the content of an expert evaluation that Villa
> might have obtained, but the example of Dr. King's evaluation
> illustrates a risk that Villa avoided. This evaluation contains many
> inconsistencies with Stone's presentence investigation report. Stone
> provides no explanation for these inconsistencies other than to blame
> Villa for not spending enough time meeting with him and working on
> his case. If Stone had been molested as a teenager, homeless, addicted
> to pain killers, a consistent marijuana user, and engaged in role-
> playing, exhibitionism, and public sex, there is nothing in the record
> indicating why he did not provide this information to Villa and did not
> seek to include it in the presentence investigation report. If Villa had
> obtained an evaluation with such inconsistencies, she would have been
> left with the difficult task of explaining the situation to the Court,
> which she knew was not receptive to psychological evaluations in any
> event.

> Although Stone seems to view the inconsistent information in the evaluation as helpful to him, I need search no farther than *Cameron* to draw a reasonable inference that the Court would not have looked favorably on an expert evaluation that was inconsistent with the presentence investigation report. The Court remained uncertain about Cameron's risk of recidivism, and it seems likely that the Court would have reached the same conclusion as to Stone if it had been presented with an evaluation like Dr. King's. Therefore, obtaining an expert evaluation of Stone was not a clear winner, and it was not deficient for [counsel] to decide not to pursue an evaluation as a tactical decision.

*Id.* at 5-6 (quoting *Recommended Decision* at 10-11).

Describing the Magistrate Judge's comments as "problematic," Mr. Stone is "incredibly dubious" about Attorney Villa's stated concerns about his honesty, particularly about his sexual interest in children. *Id.* at 6. He points out that he consistently denied such an interest in his first meeting with Attorney Villa, at the presentence interview, and in his "To Whom It May Concern" letter. In fact, Mr. Stone observes that Attorney Villa argued at the sentencing hearing that he was not sexually interested in children. *Id.* at 7.

Unlike other parts of Mr. Stone's argument, the Court does not know quite what to make of his concern about Attorney Villa's sense of his lack of candor. Here is a young man who sought out and collected images of child pornography, who engaged in a highly sexual online chat with a person he thought was a fifteen-year-old girl, who sent this girl images of child pornography, including pornography involving very young children, and who masturbated in front of a webcam and transmitted a streaming video of his masturbation to her, yet who repeatedly denied any sexual interest in children. Attorney Villa's stated hesitancy about

78

whether Mr. Stone was being completely honest with her was fully justified. The Court overrules Mr. Stone's objection to this portion of the Recommended Decision.

Mr. Stone disputes the Magistrate Judge's conclusion that "there [was] nothing in the record indicating why [Stone] did not provide" counsel with historical information omitted in the PSR. *Id.* at 6. He suggests it was Attorney Villa's fault because she failed to spend enough time with him and was dismissive of him, and because he was paranoid. *Id.* at 7.

Although only Mr. Stone knows the real reasons for his conduct, from the Court's perspective, the most likely explanation of Mr. Stone's misrepresentations and lack of candor about his background is that they resulted from a conscious, strategic decision. At both his Rule 11 hearing on January 9, 2008, and his sentencing hearing on April 7, 2008, the Court expressly advised Mr. Stone about the purpose of the PSR and the need for it to be accurate. *See Tr. of Proceedings* at 29:17-30:7 (ECF No. 18); *Sentencing Tr.* at 9:22-10:23 (ECF No. 16). Mr. Stone assured the Court that he had read and understood the report, and that he did not believe anything in the report was "in any way inaccurate or incorrect." *Sentencing Tr.* at 10:19-23.

It is clear both as a matter of record and as a matter of common sense that the sentencing judge is going to rely on the contents of the PSR in determining the sentence, that the contents of a PSR must be true and accurate, and that the Defendant is the one who knows his own life story. Yet when asked about his background, Mr. Stone did not tell the whole story to Ms. Villa, to the Probation

Officer, or to the Court.  He disclosed much more to Dr. King, but only after he had been sentenced, when he had an incentive to do so as a way to attack his sentence; Mr. Stone's premise that he would have disclosed the same information to Dr. King before sentencing is purely speculative and difficult to credit.  The Magistrate Judge was not bound to accept his current defense counsel's speculations as to why Mr. Stone was not forthright prior to sentencing, and neither is this Court.  The Court overrules Mr. Stone's objection to the Magistrate Judge's finding concerning an absence of evidence for Mr. Stone's motivations behind his prior failure to be forthright.

While Mr. Stone blames Attorney Villa for failing to discover his true background, it is just as logical, if not more so, to conclude that Mr. Stone made a personal strategic decision.  He could have failed to disclose his true history, including the past sexual assault, his alienation from his classmates, his full criminal history, his addiction to Percocet and Demerol, and other matters, in the hope that the Court would view his descent into child pornography as wholly aberrational.  He could also then maintain that he had returned to his senses, had a stable relationship with his fiancée, had stayed away from pornography, and had generally gotten his life back together.

In fact, this is precisely the argument that was made.  During his allocution, Mr. Stone told the Court:

> Your Honor, I am not the monster that these guidelines make me out
> to be.  I am a very decent, down-to-earth, young man.  I don't smoke; I
> don't do drugs; and I very rarely drink.  I'm a very family-oriented,

loving, caring, understanding person.  I am a hardworking, dedicated, honest, and loyal person, as well.

*Sentencing Tr.* at 37:2-7.  He urged the Court to allow him to "resume [his] normal life with [his] family" and to "see who [he] really [is] and [to] take who [he] really [is] into consideration when" the Court decides "on the length of [his] sentence."  *Id.* at 37:23-38:1.

In imposing the sentence, the Court accepted his premise and commented that "there's nothing in this defendant's history or background that would predict he would be standing in front of this court facing a prison term of over 17 years." *Id.* at 42:18-23.  The Court observed that he did not have "any alcohol or drug abuse problem," only "the very slight hint" of trouble with the law, and that his appearance in court was "totally unheralded."  *Id.* at 43:7-11.  This left the Court with the view that his obsession with some truly horrific images of child pornography and his conduct with a supposed fifteen-year-old minor were "inexplicable."  *Id.* at 43:13-44:22.

Mr. Stone's misrepresentations about his background appear to have been calculated to set up his attorney's argument at sentencing that his criminal conduct was an inexplicable aberration for an otherwise normal young man unlikely to reoffend.[11]  Unfortunately for Mr. Stone, the apparently aberrational nature of his crime did not convince the Court to impose a more lenient sentence, but the strategy

---

[11]   The Court acknowledges that a more benign explanation of his misrepresentations at the sentencing hearing—such as embarrassment about the undisclosed and private facts of his life—is possible.  But it hardly seems purely coincidental that Mr. Stone's allocution fits perfectly with his attorney's argument that his criminal conduct was wholly aberrational.  In any event, Mr. Stone's representations to the Court cannot be fully reconciled with his representations to Dr. King, so the misrepresentations must have been deliberate.

was, to some extent, successful, as the Court sentenced Mr. Stone to the very bottom of the Guideline sentence range.  During the sentencing hearing, as Mr. Stone points out, the Court struggled with the apparently stark contrast between his prior life and his criminal conduct.

Having received a 210-month prison term, Mr. Stone has nothing to lose by trying a different tack, one that places his crime in the context of a troubled life. But had he gone this route at sentencing, it would not have been risk-free. Revealing the truth about his past would have tied Mr. Stone's criminal actions to his true background and would have raised significant concerns, despite Dr. King's reassurances, regarding his risk of recidivism.  In any event, and for whatever reason,, Mr. Stone elected not to tell the whole truth about his life history until long after he was sentenced.  A § 2255 petition, however, is not a vehicle to discard failed strategic choices and try new ones.

### c.    Substitute Justifications

Mr. Stone turns to what he describes as a "more fundamental problem" with the Magistrate Judge's Recommended Decision.  *Pet'r's Objection* at 7-10.  He contends that "[l]ike the government, the judge attributed to defense counsel concern that some discovery or ethical ramifications would flow from a negative evaluation."  *Id.* at 7.  However, Mr. Stone claims that although she discussed a number of perceived risks during her deposition, she testified:

> **Those were not—I don't recall that that was part of what I was concerned with.  Mostly it was just the fact that he was minimizing with me.  I did not see him acting in any other—in**

> **any other method and so that if it just came back as being minimizing, that wasn't going to help him.**

*Id.* at 9 (quoting *Villa Dep.* at 94:6-15) (emphasis in original).   Quoting this testimony, Mr. Stone cites caselaw to show that a court "may not substitute [its] judgment for counsel's in assessing the reasonableness of counsel's performance" and he argues that "[t]his is what the judge has done here." *Id.* at 9-10.   The Court has discussed this issue and rejects Mr. Stone's attempt to so narrowly circumscribe Attorney Villa's thinking.

### E.   Oral Argument

Mr. Stone requests oral argument.   The Court denies that request.   The basis of the request is that "Stone's ineffective assistance of counsel claim is novel and exceedingly nuanced.   Argument will undoubtedly assist the Court in ruling on its merits." *Pet'r's Objection* at 29.   The Court carefully studied the written arguments of counsel and finds that Mr. Stone's current counsel have done an exceptional job in marshaling the facts and the law in support of their client's position.   As the written argument is especially clear, the Court concludes that oral argument would not assist its resolution of the pending petition.

### F.   Certificate of Appealability

Mr. Stone objects to the Magistrate Judge's recommendation that the Court decline to certify his claim for appeal, but maintains that he "was not obligated to seek a certificate at the time he filed his § 2255 petition" and "respectfully reserves the right to seek a certificate at a later date." *Pet'r's Objection* at 29-30, n.3.

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Before entering the final order the court may direct the parties to submit arguments on whether a certificate should issue." RULES GOVERNING SECTION 2255 PROCEEDINGS 11(a). Local Rule 83.10 provides that "[a] petitioner wishing to appeal from the denial of a . . . § 2255 petition must file a timely notice of appeal and should promptly apply to the district judge for a certificate of appealability." D. ME. LOC. R. 83.10.

In accordance with Rule 11(a) and Local Rule 83.10, the Court directs Mr. Stone to submit his argument on whether a certificate of appealability should issue. The Court gives Mr. Stone twenty-one days from the date of this Order to move for a certificate of appealability. If he does so move, the Government will have fourteen days to respond. In accordance with Mr. Stone's request and Rule 11(a), the Court will issue a final order upon the resolution of any issue regarding the issuance of a certificate of appealability.

## V.    CONCLUSION

The Court has reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record, and has made a de novo determination of all matters adjudicated by the Magistrate Judge's Recommended Decision. Except as noted in this decision, the Court concurs with the Magistrate Judge for the reasons set forth in her Recommended Decision. For those reasons and for the reasons set forth in this decision, the Court issues the following Orders:

1. The Court AFFIRMS the Recommended Decision of the Magistrate Judge on the merits of Adam Stone's § 2255 motion (ECF No. 86);

2. The Court DENIES the Petitioner's Motion for Oral Argument (ECF No. 90);

3. The Court DENIES the Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 27);

4. The Court ORDERS that Adam Stone has twenty-one days from the date of this order to move for a certificate of appealability and if he does move for said certificate of appealabity, the Government will have fourteen days to respond; and,

5. The Court withholds issuing a final order until such time as any issue regarding the issuance of a certificate of appealabilty has been resolved.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 17th day of January, 2013